No. DA 06-0660

IN THE SUPREME COURT OF THE STATE OF MONTANA

2007 MT 122

IN THE MATTER OF Z.M.,

    A Youth.

APPEAL FROM:    The District Court of the Twentieth Judicial District,
In and For the County of Sanders, Cause No. DJ-05-08,
Honorable C. B. McNeil, Presiding Judge

COUNSEL OF RECORD:

    For Appellant:

        Jim Wheelis, Chief Appellate Defender; Roberta R. Zenker,
Assistant Appellate Defender, Helena, Montana

    For Respondent:

        Honorable Mike McGrath, Attorney General; Ilka Becker, Assistant
Attorney General, Helena, Montana

        Coleen Magera, County Attorney, Thompson Falls, Montana

Submitted on Briefs:  February 28, 2007

Decided:   May 30, 2007

Filed:

_____
Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1 Z.M., a youth under the age of eighteen years, appeals from an order of the Twentieth Judicial District Court, Sanders County, denying Z.M.'s motion to suppress. We affirm in part, reverse in part, and remand.

¶2 We address the following issues on appeal:

¶3 1. Did Z.M. reserve his right to appeal the Youth Court's denial of his motion to suppress?

¶4 2. Did the Youth Court err in denying Z.M.'s motion to suppress?

## BACKGROUND

¶5 On the morning of November 3, 2005, Z.M.'s mother called the Hot Springs High School to report that Z.M., her fourteen-year-old son, had not returned home the previous night, and she requested that Z.M. be picked up and that she be contacted if he was found. The school's resource officer, Chris McGuigan, then told Officer Chad Bache, a reserve police officer for Hot Springs, Montana, to keep a lookout for Z.M. and D.O., a seventeen-year-old youth who was also absent from school. McGuigan asked that the boys be brought to him if found. In that same conversation, Bache told McGuigan that two businesses in town, an auto parts store and a health clinic, had been burglarized. He asked McGuigan to listen for any talk among the students about the burglaries.

¶6 Later that morning, Bache spotted Z.M. and D.O. walking along a street in Hot Springs. Bache stopped and asked the boys what they were doing. Bache detected the odor of alcohol coming from the boys. He took Z.M. and D.O. to the station, where Bache learned that the local bowling alley had also been broken into. Z.M. and D.O.

2

were questioned about the burglaries, and Z.M. confessed that they had committed the bowling alley burglary. Z.M.'s shoes were taken as evidence at the end of his interview with police. Z.M. was charged with two counts of felony burglary, as well as misdemeanor theft, felony theft, misdemeanor criminal mischief, and misdemeanor minor in possession.

¶7      Z.M. filed a motion to suppress the evidence of the alcohol and money found on him at the initial stop by Bache, the statements that he committed the bowling alley burglary, and any evidence derived from the taking of his shoes after the interview. He argued that his constitutional rights to be free from unreasonable searches and seizures and not to incriminate himself had been violated, and that the evidence was obtained as a result of exploitation of illegal acts by the police. The Youth Court held a hearing on the motion to suppress, where conflicting testimony was given.

¶8      At the suppression hearing, Bache testified that after talking to McGuigan, he spotted Z.M. and D.O. as they walked down a street in town. When he stopped to talk to the boys, he could smell the odor of alcohol. Bache stepped out of his patrol car and asked them if they had been drinking. He said the boys told him they had not been drinking alcohol that day, but he may have smelled alcohol on them because they had been drinking the night before. Bache said he could smell alcohol on both boys, but it was stronger on D.O. Although Bache detected signs of intoxication with D.O., such as weaving back and forth and bloodshot eyes, he did not detect those symptoms in Z.M. When Bache asked the boys why they were not in school, they replied that they were not

3

going to go to school. Bache told them that since he could smell alcohol, he needed to take them to city hall to call their parents and let them know what was going on.

¶9 Before he put the boys in his car, Bache said he noticed that Z.M.'s shirt was bulky and that he could hear a clanking noise coming from D.O.'s pockets, so he asked them what they had in their pockets. Z.M. pulled out a bottle of vodka from his sweatshirt pocket. D.O. had a Pepsi bottle, a bottle of tequila, and another bottle of liquor. Bache said the boys turned their pockets inside out, revealing that they both had money. Bache testified that he looked at the money but gave it back. He stated that it is normal practice to have a person empty their pockets before having them get in the police car. Z.M. asked him if they were going to jail. Bache repeated that they were just going to go to city hall. He put the boys in the car and transported them to the police station at the city hall. He denied that the boys were under arrest at this time.

¶10 Z.M.'s testimony with regard to this stop is slightly different. Z.M. testified that when Bache asked him if he had been drinking, he told him no. Z.M. admitted that D.O. had been drinking and showed signs of intoxication. Z.M. also stated that Bache put his hands in the boys' pockets and pulled out the alcohol and the money. He said that Bache kept the money along with the alcohol and placed it all in his front seat until they got to the station.

¶11 Witnesses also gave conflicting testimony with regard to the events at the police station. Bache testified that Z.M.'s parents were contacted. While waiting for them to arrive, the owner of the local bowling alley came into the station and reported that the bowling alley had been burglarized and that money and alcohol had been taken. Bache

4

testified that Chief of Police Frank Ceely also arrived and stayed for about fifteen to twenty minutes. Bache stated that he did not question the boys prior to when Z.M.'s parents arrived, which was about twenty to thirty minutes after they had been called. Bache insisted that he advised Z.M. of his rights, that Z.M.'s parents were present when he did so, and that they consented to the interview. Bache said he tape recorded the interview, but that the tape was likely thrown away when the evidence room was cleaned. He did not have Z.M. sign a waiver of his rights although he had a waiver form available.

¶12 Bache further testified that Z.M. began to cry when he started questioning the boys about the burglaries in town, and that Z.M. confessed to the bowling alley burglary. He said Z.M.'s father told him Z.M. should not have had any money on him, so he then took the money back from Z.M. and placed it on the desk next to the bottles of alcohol. The boys told the officers that they had stashed some bottles of alcohol in the creek behind the bowling alley. The questioning lasted about ten minutes. Bache said that Chief Ceely left to take photographs of the alcohol in the creek after Z.M.'s parents arrived and the boys had confessed to the bowling alley burglary. At the end of the interview, Bache asked Z.M. to leave his shoes so he could see if they matched some footprints found on the bowling alley lanes.

¶13 Chief Ceely testified that he came to the station that morning to talk to Bache about the three burglaries that occurred earlier that morning. He said he was under the impression that the boys had already confessed to the bowling alley burglary. Z.M. was crying and Ceely saw money and bottles of alcohol on the desk. He said that he was entering information into the computer when, across the desk from him, D.O. began to

5

giggle. He said he commented to D.O. that "You guys did four burglaries and you think it's funny," to which D.O. responded, "No, I don't think it's funny that you're saying we did four burglaries when we only did one." Chief Ceely said that when he left to take photographs of the bowling alley and the containers of alcohol in the creek, he did not think Z.M.'s parents had arrived yet. When he returned to the station after taking photographs, Z.M.'s parents were there.

¶14 Z.M.'s mother testified that when she and Z.M.'s father arrived at the police station, they were told Z.M. had been involved in some thefts. She said Bache, Chief Ceely, Z.M. and D.O. were there. She said Z.M. looked tense, but was not crying at that point. Z.M.'s mother testified that the money and bottles of alcohol were sitting on the desk when she arrived, and that the officer did not search Z.M.'s pockets nor take any money from Z.M. while she was there. She remembered that there was a tape recorder on the desk. She said she did not recall if Bache told Z.M. he had the right to remain silent. She said she did not believe Bache told Z.M. he had a right to have a lawyer with him during questioning, nor did she recall him reading any other rights to Z.M. She stated Bache did not inform Z.M. that, since Z.M. was under sixteen years old, he and his parents could agree to answer questions without a lawyer present, but that they had to sign a waiver. She said the questioning consisted of Bache telling the boys they were "liable" for breaking into the three businesses. She testified that based on Bache's questioning, she thought Bache had already asked Z.M. about the bowling alley break-in. She said that Z.M. started crying about ten minutes into the interview, which lasted about thirty minutes. Finally, she testified that it did not appear that Z.M. had been drinking.

6

¶15    Z.M. testified that when they arrived at the station, Bache began questioning Z.M. and D.O. about where they obtained the alcohol. While there, the owner of the bowling alley came in. Z.M. testified that although Bache then accused them of committing three burglaries, they only admitted to one of them. He testified that Bache also accused them of spending some of the money that was stolen. Z.M. said that he began to cry because he thought he was going to jail. He said his parents arrived and Bache turned on the tape recorder and went through the questioning again, including the accusations that Z.M. and D.O. burglarized all three businesses. Z.M. testified that Bache did not inform him that he had a right to remain silent, that he could call a lawyer before being questioned, or that he could stop the questioning at any time. He said that he was not provided with any waiver or paperwork to sign regarding his rights.

¶16    Based on the parties' briefs filed in connection with the motion to suppress and the testimony of the witnesses at the hearing, the court entered its findings of fact, conclusions of law, and order. Of note, the court found that, based on the smell of alcohol emanating from one or more of the youths, Bache properly decided to take them to the police station to notify their parents. Bache began to question the boys about the alcohol, and after being informed of the bowling alley burglary, accused them of committing all three burglaries, all before Z.M.'s parents arrived. Z.M. began to cry and confessed that they had committed the bowling alley burglary but not the other two. When Chief Ceely arrived, he saw that Z.M. was crying and noted bottles of alcohol and money on the desk. Chief Ceely then left to take photographs, and when he returned, Z.M.'s parents had arrived. The Youth Court found that when Z.M.'s parents arrived,

7

Bache read Z.M. his rights and continued to question him about the bowling alley burglary. Bache did not have Z.M. and his parents sign a waiver because he had recorded his reading of *Miranda* rights to Z.M. The Youth Court found that Z.M. and his parents consented to the interview.

¶17 Based on these findings of fact, the court concluded that the youths were engaged in wrongdoing in that they were truant. Thus, the officer was justified in stopping the boys. Further, the court concluded that Bache was acting as a community caretaker in approaching youths known to be truant, and that because he smelled alcohol, he was justified in taking the youths to the police station for their safety. Further, for his own safety, Bache was justified in searching the youths' pockets prior to placing them in the police car. Finally, the court summarily concluded that Z.M.'s statement was voluntary and the shoes were thus not fruit of the poisonous tree. The Youth Court thus denied Z.M.'s motion to suppress.

¶18 Z.M. subsequently pled guilty to one felony count for the bowling alley burglary. The remaining charges were dropped. The court found Z.M. to be a delinquent youth and ordered two years probation. The court also determined that Z.M. should pay restitution, but reserved Z.M.'s right to a hearing on the restitution amount and stayed payment of restitution pending Z.M.'s appeal to this Court. Z.M. appeals from the court's order denying his motion to suppress.

## STANDARD OF REVIEW

¶19 This Court reviews a youth court's ruling on a motion to suppress to determine whether the findings of fact are clearly erroneous and whether those findings were

8

correctly applied as a matter of law. *In re R.L.H.*, 2005 MT 177, ¶ 16, 327 Mont. 520, ¶ 16, 116 P.3d 791, ¶ 16. A finding is clearly erroneous if it is not supported by substantial evidence, the court has clearly misapprehended the effect of the evidence, or this Court is left with a definite and firm conviction that the youth court made a mistake. *State v. Bauer*, 2001 MT 248, ¶ 12, 307 Mont. 105, ¶ 12, 36 P.3d 892, ¶ 12.

## DISCUSSION

¶20 **ISSUE 1: Did Z.M. reserve his right to appeal the Youth Court's denial of his motion to suppress?**

¶21 In response to Z.M.'s appeal, the State argues that Z.M. failed to reserve his right to appeal the denial of his motion to suppress and is not now appealing the voluntariness of his guilty plea. Accordingly, the State does not address the merits of the appeal. It is true that, generally, when a defendant enters a guilty plea, he waives the right to appeal all nonjurisdictional defects which occurred prior to entry of the plea. *State v. Samples*, 2005 MT 210, ¶ 11, 328 Mont. 242, ¶ 11, 119 P.3d 1191, ¶ 11. However, a defendant pleading guilty may expressly reserve the right to appeal the adverse determination of any specified pretrial motion. Section 46-12-204(3), MCA.

¶22 In this case, a hearing was held in March 2006, regarding Z.M.'s motion to suppress evidence and the statements he gave at the police station. The Youth Court issued its order denying the motion in April 2006. Z.M. appeared in court on May 9, 2006, for a status hearing. After some discussion, he pled guilty to one count of felony burglary and the State dismissed the remaining charges. The minute entry in the court record noted that the plea was entered "subject to the Court's ruling on the Suppression

9

Motion filed herein by Youth's counsel." The court noted that Z.M.'s counsel was concerned there was an issue with restitution that would later need to be resolved by the Youth Court. Finally, the minute entry noted that the court "reserves to the Youth the right to appeal, pending the outcome of the proposed suppression hearing."

¶23 The Youth Court issued an order on July 3, 2006, which adjudicated Z.M. to be a delinquent youth, ordered two years of probation, and further stated that the "youth shall reserve his right to a hearing on the amount of restitution." Z.M. did not request a hearing on the question of restitution. Z.M. appealed on August 30, 2006. A month later, the parties appeared in Youth Court on the State's petition to revoke the probation imposed for the felony burglary. The Youth Court refused to address the issue because the matter had already been sent to the Montana Supreme Court and was no longer within the Youth Court's jurisdiction. The State then requested that its petition to revoke be dismissed and that the case be sent to the Montana Supreme Court.

¶24 The State now asserts that the court's statement in the May 9, 2006, minute entry—that the court reserved to Z.M. the right to appeal pending the outcome of the proposed suppression hearing—was intended to be a reference to the possibility of a restitution hearing since the suppression hearing had already been held. Thus, the State argues, Z.M. failed to show that he reserved his right to appeal the suppression issue with the approval of the court and the consent of the prosecutor, as required by § 46-12-204(3), MCA.

¶25 In the context of all the court's statements taken together, the only issue that could be appealed in this case is the order denying Z.M.'s suppression motion. Since Z.M. did

not request a hearing on restitution, the issue remained uncontested and thus was not an issue he could appeal. There is no evidence that the State objected to the court's reservation of the suppression issue for appeal, and in fact, the State agreed to the case being sent to this Court to address the appeal that was filed. Thus, we conclude that Z.M.'s right to appeal the suppression issue was properly reserved.

¶26 **ISSUE 2: Did the Youth Court err in denying Z.M.'s motion to suppress?**

¶27 Z.M. argues the Youth Court erred in denying his motion to suppress (1) the alcohol and money found on him at the initial stop by Bache, (2) his confessions that he committed the burglary at the bowling alley, and (3) any evidence derived from the taking of his shoes after the interview.

### *(1) The Alcohol and Money*

¶28 The Fourth Amendment to the United States Constitution and Article II, Section 11 of the Montana Constitution protect individuals from unreasonable searches and seizures, including investigatory stops by police officers. *State v. Niles*, 2002 MT 282, ¶ 10, 312 Mont. 453, ¶ 10, 59 P.3d 1129, ¶ 10 (citations omitted). Before stopping a person, an officer must have particularized suspicion that the person stopped has committed, is committing, or is about to commit an offense. Section 46-5-401, MCA; *Niles*, ¶ 10. The State has the burden of proving sufficient cause for a stop by showing: "(1) objective data from which an experienced officer can make certain inferences; and (2) a resulting suspicion that the person stopped is or has been engaged in wrongdoing." *Niles*, ¶ 10 (citations omitted). Whether particularized suspicion exists depends on the totality of the circumstances. *Niles*, ¶ 10 (citations omitted).

¶29 Section 46-6-310, MCA, provides that whenever a police officer is "authorized to arrest a person without a warrant, the officer may instead issue the person a notice to appear." A police officer is authorized to arrest a person without a warrant "if the officer has probable cause to believe that the person is committing an offense and existing circumstances require immediate arrest." Section 46-6-311(1), MCA; *State v. Van Dort*, 2003 MT 104, ¶ 19, 315 Mont. 303, ¶ 19, 68 P.3d 728, ¶ 19. Probable cause to arrest "involves something more than an officer's mere suspicion of criminal activity." *Van Dort*, ¶ 19 (citations omitted). Probable cause is evaluated based on the police officer's knowledge and the relevant circumstances. *Van Dort*, ¶ 19 (citations omitted). An arrest involves (1) authority to arrest; (2) assertion of that authority with intention to effect an arrest; and (3) restraint of the person arrested. *State v. Thornton*, 218 Mont. 317, 322-23, 708 P.2d 273, 277 (1985) (citations omitted). The standard for an arrest is "whether a reasonable person, innocent of any crime, would have felt free to walk away under the circumstances." *Thornton*, 218 Mont. at 323, 708 P.2d at 277-78.

¶30 An officer's exercise of his or her discretion to arrest must be reasonable. *Bauer*, ¶ 25. Pursuant to Article II, Sections 10 and 11, of the Montana Constitution, "it is unreasonable for a police officer to effect an arrest and detention for a non-jailable offense when there are no circumstances to justify an immediate arrest." *Bauer*, ¶ 33. Only when special circumstances exist, such as concern for the safety of the offender or the public, may a police officer effect an immediate arrest for a non-jailable offense. *Bauer*, ¶ 33. In *Bauer*, a twenty-year-old man was arrested for the offense of minor in possession. *Bauer*, ¶ 8. During the arrest, Bauer was compliant with the arresting

12

officers. *Bauer*, ¶ 31. Although Bauer mentioned he had just had an argument with his girlfriend, there was no other evidence that any assault or domestic abuse was occurring. *Bauer*, ¶ 31. We concluded that this did not constitute circumstances that required Bauer's immediate arrest. *Bauer*, ¶ 32. Rather than subjecting Bauer to the indignity of an arrest, police officers should have given him a notice to appear as that would have served the interests of law enforcement. *Bauer*, ¶ 33.

¶31 Pursuant to § 41-5-321(1), MCA, of the Youth Court Act, a person under the age of eighteen years may be taken into custody by a law enforcement officer pursuant to a lawful arrest for violation of the law. Taking a youth into custody is "not an arrest except for the purpose of determining the validity of the taking under the constitution of Montana or the United States." Section 41-5-321(2), MCA. Since Z.M. has argued that his being taken into custody was unconstitutional, we will treat the taking as an arrest for the purpose of determining whether the taking was valid.

¶32 A search without a warrant is *per se* unreasonable. *State v. Galpin*, 2003 MT 324, ¶ 54, 318 Mont. 318, ¶ 54, 80 P.3d 1207, ¶ 54. However, when a lawful arrest is made, a police officer may "reasonably search the person arrested and the area immediately within his reach in order to locate any weapons the person might use or any evidence that might otherwise be destroyed." *Galpin*, ¶ 54 (citations omitted); § 46-5-103, MCA.

¶33 Z.M. concedes that Bache had a right to stop Z.M. in order to tell him he needed to go home or contact his mother. Z.M. argues that Bache had no right to proceed beyond this point because there was no evidence Z.M. was engaged in criminal behavior. In response to Z.M.'s motion to suppress, the State argued that Bache was allowed to make

13

the stop and take the youths into custody based on the community caretaker doctrine and probable cause.

¶34 The Youth Court concluded that based on the community caretaker doctrine, Bache was justified in stopping the youths. When Bache then smelled alcohol on the youths, he was justified in taking them to the police station for their safety. Finally, the court concluded Bache, for his own safety, was justified in determining what the youths had in their pockets prior to putting the youths in the police car.

¶35 When Bache stopped and talked to Z.M., he knew that Z.M. was truant, which was the basis for the stop. Z.M. concedes this was a reasonable basis to stop Z.M. While talking to the boys, Bache smelled alcohol, which was objective data from which Bache, a trained officer, could infer the underage boys had been drinking. A person under the age of twenty-one years old is prohibited from possessing or consuming an intoxicating substance. Section 45-5-624, MCA. Bache thus had a particularized suspicion that Z.M. consumed or possessed alcohol in violation of the law. Bache stepped out of the car and approached Z.M. and D.O., at which time he confirmed that both boys smelled of alcohol, although the odor and signs of intoxication were more evident with D.O. Bache also noticed the bulge in Z.M.'s front pocket.

¶36 Based on the fact that Bache smelled alcohol on Z.M., Bache's particularized suspicion that Z.M. had been drinking developed into probable cause to believe that Z.M. committed the offense of consuming or possessing alcohol. Because MIP is a non-jailable offense, the question, then, is whether the circumstances surrounding the stop, including concern for Z.M.'s safety or the public's safety, required immediate arrest.

14

*Bauer*, ¶ 33. Bache had determined that Z.M. had been drinking. Bache was concerned Z.M. could obtain more alcohol and continue drinking. Unlike in *Bauer*, where the defendant was twenty years old, Z.M. was only fourteen years old. Bache knew that Z.M. had been missing from home overnight and was truant from school with no intent to return. Further, in taking custody of Z.M., Bache was acting at the request of both Z.M.'s mother and the school's resource officer that he be picked up when found. These circumstances warranted immediate arrest. Thus, it was reasonable for Bache to take Z.M. into custody for the youth's safety.

¶37 Bache argues that he did not place Z.M. under arrest, but merely transported him to the police station. However, we conclude that Z.M. was taken into custody, and for the purposes of our constitutional analysis, an arrest occurred at this point. Bache, as a reserve officer of the town of Hot Springs, had the authority to arrest. By placing the boys in the back of his patrol car, he was asserting his authority to arrest, and as a result, the boys were not free to leave at that time. A reasonable person under the circumstances would not have felt free to walk away. In this case, Z.M. was fearful he was going to jail. He was clearly aware of the authority that Bache held over him, and cooperated when told to get in the car. Finally, because Bache made a lawful arrest, he was entitled to search Z.M. and the area within his reach to locate weapons or evidence. Section 46-5-103, MCA. In this case, Bache found the money and a bottle of alcohol.

¶38 We affirm the court's denial of Z.M.'s motion to suppress the money and alcohol on the basis that Bache had probable cause to make an arrest, including circumstances requiring immediate arrest, and thus it was constitutionally permissible for Bache to take

15

Z.M. into custody pursuant to § 41-5-321, MCA. Further, it was reasonable for Bache to conduct a search incident to that taking. Although the court based its decision on the community caretaker doctrine, we will affirm a correct result even if the court comes to that result for the wrong reason. *State v. Daniels*, 2005 MT 110, ¶ 13, 327 Mont. 78, ¶ 13, 111 P.3d 675, ¶ 13.

### *(2) Z.M.'s Confessions*

¶39 The Fifth Amendment to the United States Constitution and Article II, Section 25, of the Montana Constitution provide that a person has a right not to incriminate himself. A confession must be given freely, voluntarily, and without compulsion. *State v. Grey*, 274 Mont. 206, 209, 907 P.2d 951, 953 (1995) (citations omitted). If a defendant's confession is involuntary, use of that confession in a criminal trial would violate the defendant's right against self-incrimination and right to due process of law. *Grey*, 274 Mont. at 210, 907 P.2d at 953 (citations omitted). A defendant may waive his Fifth Amendment rights only if the waiver is made voluntarily, knowingly, and intelligently. *Grey*, 274 Mont. at 210, 907 P.2d at 953 (citing *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612 (1966)). The evidence must show that the defendant intelligently understood his rights and rejected them. *Grey*, 274 Mont. at 213, 907 P.2d at 955 (citing *Miranda*, 384 U.S. at 475, 86 S. Ct. at 1628).

¶40 This Court has consistently held that when conducting custodial interrogations at a police station or other controlled environment, a police officer should preserve a tangible record of his giving of the *Miranda* warning and the knowing, intelligent waiver by the defendant. *Grey*, 274 Mont. at 214, 907 P.2d at 956; *State v. Cassell*, 280 Mont. 397,

403, 932 P.2d 478, 481 (1996); *State v. Lawrence*, 285 Mont. 140, 156, 948 P.2d 186, 195 (1997). In *Grey* and *Cassell*, we held that the failure of the officer to preserve such a record will be viewed with distrust, especially when the means of making a record are readily available to the officer. *Grey*, 274 Mont. at 214, 907 P.2d at 956; *Cassell*, 280 Mont. at 403, 932 P.2d at 481; *Lawrence*, 285 Mont. at 156, 948 P.2d at 195. When this issue was before us in *Lawrence*, we emphasized that the failure to preserve a tangible record when the means to do so are readily available would be looked on with *extreme disfavor* in determining the voluntariness of a *Miranda* waiver. *Lawrence*, 285 Mont. at 156, 948 P.2d at 195.

¶41 The Youth Court Act provides that when youth are taken into custody for questioning, the youth must be advised of his right against self-incrimination and right to counsel. *State v. McKee*, 2006 MT 5, ¶ 22, 330 Mont. 249, ¶ 22, 127 P.3d 445, ¶ 22 (citations omitted). Section 41-5-331, MCA, provides in relevant part:

> (1) When a youth is taken into custody for questioning upon a matter that could result in a petition alleging that the youth is either a delinquent youth or a youth in need of intervention, the following requirements must be met:
> (a) The youth must be advised of the youth's right against self-incrimination and the youth's right to counsel.
> (b) The investigating officer, probation officer, or person assigned to give notice shall immediately notify the parents . . . .
> (2) A youth may waive the rights listed in subsection (1) under the following situations:
> . . .
> (b) when the youth is under 16 years of age and the youth and the youth's parent or guardian agree, they may make an effective waiver; or
> (c) when the youth is under 16 years of age and the youth and the youth's parent or guardian do not agree, the youth may make an effective waiver only with advice of counsel.

17

Any extrajudicial statement made by a youth that would be constitutionally inadmissible in a criminal matter may not be received into evidence in a youth court proceeding. Section 41-5-1415, MCA.

¶42 A person is entitled to *Miranda* warnings when he is subject to a custodial interrogation. *McKee*, ¶ 28 (citing *State v. Olson*, 2003 MT 61, ¶ 14, 314 Mont. 402, ¶ 14, 66 P.3d 297, ¶ 14). Whether a custodial interrogation has occurred is determined based on examining six factors:

> (1) place of the interrogation; (2) time of the interrogation; (3) persons present during the interrogation; (4) whether *Miranda* warnings were gratuitously given; (5) the length and mood of the interrogation; and (6) whether or not the suspect was arrested following the interrogation.

*McKee*, ¶ 28 (citations omitted). An interrogation refers to express questioning as well as "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *McKee*, ¶ 31 (citing *Olson*, ¶ 18). "In analyzing whether an officer's words 'are reasonably likely to elicit an incriminating response,' we focus on the perception of the suspect, not the intent of the officer." *McKee*, ¶ 31 (quoting *Olson*, ¶ 18).

¶43 With regard to the first statement Z.M. gave, the Youth Court found that Bache began to question the youths about the alcohol in their possession. When he learned of the bowling alley burglary, Bache accused the boys of having committed the bowling alley burglary and the other two burglaries. Z.M. began to cry and told Bache they committed the bowling alley burglary but not the other two. Bache elicited this confession before he gave any *Miranda* warnings and before Z.M.'s parents arrived.

18

Armed with the information obtained from Z.M. and D.O. at this time, Chief Ceely left the police station to take photographs of the containers of alcohol that the boys said they put in the creek behind the bowling alley.

¶44 The interrogation occurred at the police station, with only police officers and a co-defendant present. Bache questioned the boys for approximately twenty minutes before Z.M.'s parents arrived. Z.M., a fourteen year old and the youngest one present, had already expressed fear that he was going to jail. Bache should have known that his comment that Z.M. and D.O. had committed three burglaries was reasonably likely to elicit an incriminating response from Z.M. To absolve himself of the blame that would result if it were assumed he committed three crimes, Z.M. admitted to committing one. Similarly, Chief Ceely should have known that his suggestion that the boys had committed four burglaries, when in fact only three were reported, would reasonably lead to the boys confessing to one crime to avoid culpability for the other crimes. Although Z.M. was not arrested but rather sent home in his parents' care following the interrogation, he was subsequently charged with several crimes, including the one to which he confessed.

¶45 Given these circumstances, it is clear that Z.M. was subjected to a custodial interrogation at the station. Pursuant to § 41-5-331, MCA, Bache and Chief Ceely should not have started questioning Z.M. until they gave him his *Miranda* warnings, and, in light of Z.M.'s age, until his parents arrived and he had a chance to consult with them on whether or not to waive his rights. Since the above interrogation was conducted in contravention to Z.M.'s statutory and constitutional rights to remain silent and consult

19

with his parents and/or counsel, § 41-5-331, MCA; Mont. Const. art. II, § 25, we conclude that his confession to the burglary was not voluntary. Accordingly, the Youth Court erred in not granting Z.M.'s motion to suppress the confession.

¶46 With regard to the second statement Z.M. gave after the arrival of his parents, the Youth Court found that Bache read Z.M. his *Miranda* warnings and continued to question him about the bowling alley burglary. Instead of having Z.M. and his parents sign a written waiver on a form that was available, Bache recorded his reading of the *Miranda* warnings to Z.M. The court further found that Z.M. and his parents consented to the interview. Z.M. was questioned for about ten more minutes, during which he again confessed to the bowling alley burglary. During the questioning, Z.M.'s shoes were taken from him for evidentiary purposes.

¶47 Z.M. argues that there is no substantial evidence that Bache read *Miranda* warnings and that Z.M. and his parents consented to the interview. Bache contends that he did read the warnings to Z.M. in the presence of his parents, and that the warning was recorded on tape. The State, however, was not able to produce the tape. Further, Z.M. and his mother both testified that the *Miranda* warnings were not read during the interview. Bache admits that he did not have Z.M. and his parents sign a waiver form because he had recorded the reading of *Miranda*.

¶48 We conclude there is no substantial evidence to establish that Z.M. was read his *Miranda* warnings and intelligently understood his rights and rejected them. Bache had waiver forms readily available to him, but he did not have Z.M. or his parents sign one. Further, although the parties agree that Bache had a tape recorder on the table during the

20

interview, Bache was not able to produce the tape that Bache claims would have established he read Z.M. his *Miranda* warnings and that Z.M. and his parents knowingly consented to the interview. Thus, Bache has failed to preserve a tangible record. This failure must be viewed with extreme disfavor. *Lawrence*, 285 Mont. at 156, 948 P.2d at 195. Based on Z.M.'s and his mother's statements that the *Miranda* warnings were not read, along with the State's failure to preserve a tangible record of the reading and waiver of rights, we conclude that the Youth Court erred in finding that Bache read Z.M. his *Miranda* warnings and that Z.M. and his parents consented to the interview. Accordingly, the Youth Court should have suppressed Z.M.'s second confession as well.

¶49 We reverse the Youth Court's denial of Z.M.'s motion to suppress his confessions. Pursuant to § 46-12-204(3), MCA, on remand, Z.M. must be allowed to withdraw his plea.

### (3) Z.M.'s Shoes

¶50 In his motion to suppress, Z.M. argued that his shoes were obtained as a result of the exploitation of the initial illegal conduct of the police; thus, the shoes were fruit of the poisonous tree. Since Z.M. does not assert this argument on appeal, the Youth Court's denial of his motion to suppress the shoes as evidence is unchallenged and remains the law of the case.

### CONCLUSION

¶51 We conclude that Z.M. reserved his right to appeal, and we affirm the Youth Court's denial of Z.M.'s motion to suppress the alcohol and the money as evidence. We

reverse the Youth Court's denial of Z.M.'s motion to suppress his confessions, and remand for proceedings consistent with this Opinion.

/S/ W. WILLIAM LEAPHART

We concur:

/S/ KARLA M. GRAY
/S/ JAMES C. NELSON
/S/ JOHN WARNER
/S/ BRIAN MORRIS