DA 07-0666

IN THE SUPREME COURT OF THE STATE OF MONTANA

2009 MT 221

STATE OF MONTANA,

      Plaintiff and Appellee,

v.

DARIN HURLBERT,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Fifth Judicial District,
In and For the County of Jefferson, Cause No. DC-2006-2064
Honorable Loren Tucker, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Jack H. Morris, Jardine, Morris & Tranel, PLLC, Whitehall, Montana
James B. Wheelis; Helena, Montana

      For Appellee:

          Hon. Steve Bullock, Montana Attorney General, C. Mark Fowler,
Assistant Attorney General, Helena, Montana

          Matthew Johnson, Jefferson County Attorney, Boulder, Montana

Submitted on Briefs:  October 1, 2008

Decided:  June 30, 2009

Filed:

_____
Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1     Darin Hurlbert appeals a judgment of the District Court for the Fifth Judicial District, Jefferson County, finding him guilty of possession of dangerous drugs, possession of drug paraphernalia, reckless driving and speeding. We affirm.

## ISSUES

¶2     Hurlbert raises on appeal two main issues and several sub-issues involving the denial of his motion to suppress. We have restated these issues for clarity as follows:

¶3     1. Whether the law enforcement officer's continued questioning of Hurlbert exceeded the scope of the stop.

¶4     2. Whether Hurlbert's wife's consent to search the vehicle was valid.

¶5     3. Whether Hurlbert was properly advised of his *Miranda* rights.

¶6     4. Whether Hurlbert's consent to search his belongings was given voluntarily.

## FACTUAL AND PROCEDURAL BACKGROUND

¶7     On the afternoon of May 16, 2006, Hurlbert was stopped for speeding by Montana Highway Patrol Trooper Jay Nelson on Interstate 90 near Whitehall, Montana. Trooper Nelson's radar confirmed that Hurlbert was traveling 103 miles per hour, more than 25 miles per hour over the speed limit in that area. When Trooper Nelson stopped Hurlbert, Hurlbert stated that he thought he was only doing 90 miles per hour.

¶8     While he was issuing a speeding citation to Hurlbert, Trooper Nelson noticed several indicators of possible illegal activity in addition to the speeding. Trooper Nelson later testified that Hurlbert was "nervous," "definitely shaking," "sweating quite a bit," and that Hurlbert "was constantly moving around, very uneasy; he would not sit still; [he

2

was] rapidly smoking a cigarette" and "he would open up his wallet and just stare at [it]." When Trooper Nelson asked Hurlbert where he was coming from, Hurlbert stated he had been visiting his parents in Bozeman, however, Hurlbert could not provide an address for his parents' house. Based on these initial observations, Trooper Nelson called Deputy Dan Haggerty with the Jefferson County Sheriff's Office to request assistance in case Trooper Nelson decided to search the vehicle.

¶9 Trooper Nelson asked Hurlbert additional questions about drug activity and Hurlbert stated there were no drugs in the vehicle. When Trooper Nelson asked whether Hurlbert would consent to a search of the vehicle, Hurlbert stated he would have to obtain his wife's permission, as the vehicle belonged to her. (The vehicle was indeed registered in the name of Hurlbert's wife.) Hurlbert also insisted that Trooper Nelson would have to obtain a search warrant to search any of Hurlbert's personal belongings that were in the vehicle. Trooper Nelson then asked Hurlbert which items in the vehicle belonged to him and Hurlbert identified a shirt, a camo-colored fanny pack and a radar detector.

¶10 By that time, Deputy Haggerty had arrived and he and Trooper Nelson had Hurlbert exit the vehicle. Deputy Haggerty patted Hurlbert down for weapons while Trooper Nelson called Hurlbert's wife, using the phone number Hurlbert had provided him. Hurlbert's wife gave Trooper Nelson permission to search the vehicle. Trooper Nelson also asked Hurlbert's wife if there was any prior drug use. She told him that Hurlbert had "prior drug activity." Trooper Nelson then searched the vehicle, except for Hurlbert's belongings, which were still in the vehicle. Trooper Nelson later testified that

3

he did not touch Hurlbert's belongings during the search of the vehicle—he "left them exactly where they were."

¶11     Due to a disability from a battle with bone cancer, Hurlbert walked with a cane. To accommodate Hurlbert's disability, he was allowed to sit in Deputy Haggerty's patrol car while Trooper Nelson conducted the search of the vehicle. Hurlbert was not handcuffed and the door to the patrol car remained open. Trooper Nelson did not find anything illegal in the search of the vehicle. However, Deputy Haggerty, who had been standing next to where Hurlbert was sitting, later testified that Hurlbert "spontaneously admitted . . . there was a blue box which contained a spoon and a syringe in his camo bag." Deputy Haggerty conveyed this information to Trooper Nelson.

¶12     Both officers testified that after Trooper Nelson completed the search of the vehicle, he advised Hurlbert of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966). Hurlbert then stated that he understood his rights, declined counsel and agreed to answer questions. Hurlbert did not, however, sign any form acknowledging he was waiving his rights. Hurlbert did sign a form giving his consent to search his personal belongings. Hurlbert also verbally gave Trooper Nelson consent to search his belongings. In the camo bag, Trooper Nelson discovered a blue metal box containing "a couple syringes, a spoon, various baggies, and . . . a white powdery substance imprinted on the spoon and in some of the baggies." Trooper Nelson conducted a field test of the white powder. The results of this test indicated it contained methamphetamine. Trooper Nelson seized the items as evidence, photographed them and arrested Hurlbert.

¶13 On May 24, 2006, the State filed an Information charging Hurlbert with criminal possession of dangerous drugs, a felony, in violation of § 45-9-102, MCA; criminal possession of drug paraphernalia, a misdemeanor, in violation of § 45-10-103, MCA; speeding, a misdemeanor, in violation of § 61-8-303, MCA; and reckless driving, a misdemeanor, in violation of § 61-8-301, MCA. Hurlbert moved to suppress the evidence seized during the stop, but the District Court denied Hurlbert's motion. Hurlbert then entered a guilty plea, reserving his right to appeal the denial of his motion to suppress evidence.

¶14 On September 14, 2007, the District Court entered its Findings, Judgment and Deferred Sentence wherein it sentenced Hurlbert to a three-year deferred imposition of sentence along with 30 days in the Jefferson County Jail and a fine of $500 on the charge of possession of dangerous drugs; six months in jail, with all but 30 days suspended, and a fine of $200 on the charge of possession of drug paraphernalia; 30 days in jail and a fine of $200 on the reckless driving charge; and a fine of $100 on the speeding charge. The court also ordered that the sentences were to run concurrently and that Hurlbert would be given credit for time served.

¶15 Hurlbert now appeals the District Court's judgment.

**STANDARD OF REVIEW**

¶16 This Court reviews a district court's denial of a motion to suppress to determine whether the court's findings are clearly erroneous. *State v. Bieber*, 2007 MT 262, ¶ 20, 339 Mont. 309, 170 P.3d 444. To determine whether a finding of fact is clearly erroneous, this Court ascertains whether the finding is supported by substantial credible

evidence, whether the district court misapprehended the effect of the evidence, and whether the Court is nevertheless left with a definite and firm conviction that the district court made a mistake. *Bieber*, ¶ 20. We further review a district court's denial of a motion to suppress to determine whether that court's interpretation and application of the law are correct. Our review in that regard is plenary. *Bieber*, ¶ 20 (citing *State v. Wetzel*, 2005 MT 154, ¶ 10, 327 Mont. 413, 114 P.3d 269).

**Issue 1.**

¶17  *Whether the law enforcement officer's continued questioning of Hurlbert exceeded the scope of the stop.*

¶18  After giving Hurlbert a citation for speeding, Trooper Nelson continued to question Hurlbert about whether he had any illegal drugs in the vehicle. Hurlbert contends that there was no basis to support this inquiry and that all evidence seized in the traffic stop was illegally obtained and must be suppressed because Trooper Nelson's continued questioning exceeded the scope of the stop. The State argues, however, that police/motorist encounters occurring after the purpose for the lawful stop has concluded or is about to conclude are not per se unlawful.

¶19  The Fourth Amendment to the United States Constitution and Article II, Section 11 of the Montana Constitution protect individuals from unreasonable searches and seizures. Moreover, warrantless searches are per se unreasonable, subject only to a few carefully drawn exceptions. *State v. Clark*, 2008 MT 419, ¶ 22, 347 Mont. 354, 198 P.3d 809 (citing *Bieber*, ¶ 29).

6

¶20 When a law enforcement officer seizes a person, such as in a brief investigatory stop of a vehicle, the right against unreasonable searches and seizures applies. *State v. Case*, 2007 MT 161, ¶ 21, 338 Mont. 87, 162 P.3d 849 (citing *State v. Roberts*, 1999 MT 59, ¶ 12, 293 Mont. 476, 977 P.2d 974). However, this Court recognizes an exception to the general warrant requirement permitting a limited and reasonable investigation without probable cause, where the State can show circumstances that create a particularized suspicion that the person is or has been engaged in wrongdoing or was a witness to criminal activity. *Case*, ¶ 21 (citing *Roberts*, ¶¶ 12-13).

¶21 In this case, Trooper Nelson clearly had particularized suspicion for the initial traffic stop as Hurlbert was exceeding the speed limit. *See* §§ 46-5-401 and 61-8-303, MCA. Nevertheless, "[a] stop authorized by 46-5-401 or 46-6-411 may not last longer than is necessary to effectuate the purpose of the stop." Section 46-5-403, MCA. However, if additional objective data of wrongdoing exists, the additional information may give rise to further suspicions and enlarge the scope of the investigation. *Case*, ¶ 34 (citing *State v. Nelson*, 2004 MT 310, ¶ 20, 323 Mont. 510, 101 P.3d 261).

¶22 At the hearing on Hurlbert's motion to suppress, there was sufficient evidence presented of objective data from which Trooper Nelson could make certain inferences of wrongdoing. For example, Trooper Nelson noticed that Hurlbert was nervous, shaking, very uneasy, and constantly moving around. Trooper Nelson also noticed that Hurlbert was sweating quite a bit; he would not sit still; he was rapidly smoking a cigarette; and he would open up his wallet and just stare at it. When Trooper Nelson asked Hurlbert where

7

he was coming from, Hurlbert stated that he had been visiting his parents in Bozeman, however, Hurlbert could not provide an address for his parents' house.

¶23 Consequently, we hold that while the purpose of the traffic stop had been effectuated, Trooper Nelson's observations gave rise to further suspicions that served to properly enlarge the scope of the investigation.

**Issue 2.**

¶24 *Whether Hurlbert's wife's consent to search the vehicle was valid.*

¶25 Hurlbert argues that because he lawfully possessed the vehicle at the time of the stop, he had a reasonable expectation of privacy in it and was thus entitled to protection from any unlawful searches and seizures. He also maintains that his wife's consent to search the vehicle was not valid because she was not in possession of the vehicle at the time of the stop and because she was coerced into consenting.

¶26 The State counters that Hurlbert did not make any colorable claim of prejudice from the search of the vehicle and, even if he had, Hurlbert did not have a possessory interest in the vehicle that superseded his wife's right as the owner of the vehicle to assert actual authority and consent to a search.

¶27 Hurlbert does not demonstrate he was prejudiced in any way from the search of the vehicle as the search of the vehicle itself revealed nothing unlawful. No contraband was found in the vehicle, and Hurlbert does not present any connection between his assertion that the search of the vehicle was illegal and his arguments pertaining to the voluntariness of his consent to search his personal belongings. "A cause may not be reversed by reason of any error committed by the trial court against the convicted person

8

unless the record shows that the error was prejudicial." Section 46-20-701(1), MCA. Hurlbert has made no such showing here.

¶28 Moreover, Trooper Nelson testified that when he asked Hurlbert for permission to search the vehicle, Hurlbert stated that Trooper Nelson would have to ask his wife because the vehicle belonged to her. We have repeatedly held that we will not put a trial court in error for a ruling or procedure in which a party acquiesced or participated. *State v. Cybulski*, 2009 MT 70, ¶ 61, 349 Mont. 429, 204 P.3d 7 (citing *State v. Clay,* 1998 MT 244, ¶ 24, 291 Mont. 147, 967 P.2d 370; *Matter of R.B.O.,* 277 Mont. 272, 283, 921 P.2d 268, 275 (1996); *In re Pedersen,* 261 Mont. 284, 287, 862 P.2d 411, 413 (1993)).

¶29 Accordingly, we hold that Hurlbert waived his right to object to the search of the vehicle when he disclaimed that he had authority to grant permission to search it, and he thereby conceded that he did not have a reasonable expectation of privacy in the vehicle.

**Issue 3.**

¶30 *Whether Hurlbert was properly advised of his Miranda rights.*

¶31 In this case, there are two separate instances when Hurlbert was questioned by Trooper Nelson, either of which could raise the issue of whether Hurlbert was properly advised of his *Miranda* rights. The first instance was immediately after Trooper Nelson handed Hurlbert the citation for speeding and Trooper Nelson questioned Hurlbert about illegal drug activity and requested Hurlbert's consent to search the vehicle. The second instance was after Trooper Nelson finished searching the vehicle and he requested Hurlbert's consent to search Hurlbert's personal belongings.

¶32 Hurlbert claims he was in custody the minute he was stopped and that he should have been given his *Miranda* warnings when Trooper Nelson first began to question him and requested Hurlbert's consent to search the vehicle. We disagree.

¶33 The Fifth Amendment to the United States Constitution and Article II, Section 25 of the Montana Constitution provide that individuals have the right not to incriminate themselves. *State v. Gittens*, 2008 MT 55, ¶ 12, 341 Mont. 450, 178 P.3d 91 (citing *In re Z.M.*, 2007 MT 122, ¶ 39, 337 Mont. 278, 160 P.3d 490). This right against self-incrimination applies to bar the use of statements obtained from a custodial interrogation "unless the defendant is warned, prior to questioning, that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has the right to the presence of an attorney."[1] *State v. Lacey*, 2009 MT 62, ¶ 59, 349 Mont. 371, 204 P.3d 1192 (citing *State v. Olson*, 2003 MT 61, ¶ 13, 314 Mont. 402, 66 P.3d 297; *Miranda*, 384 U.S. at 444, 86 S. Ct. at 1612). "Persons are considered to be 'in custody' and entitled to *Miranda* warnings 'if they have been deprived of their freedom of action in any significant way or their freedom of action has been curtailed to a degree associated with a formal arrest.' " *Lacey*, ¶ 59 (quoting *State v. Munson*, 2007 MT 222, ¶ 21, 339 Mont. 68, 169 P.3d 364). If a custodial interrogation has taken place and the person has been properly informed of their *Miranda* rights, they may waive those

---

[1] *Miranda* also requires that the person be advised that "if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *State v. Morrisey*, 2009 MT 201, ¶ 28, 351 Mont. 144, ___ P.3d ___ (citing *Miranda*, 384 U.S. at 479, 86 S. Ct. at 1630).

10

rights if the waiver is made voluntarily, knowingly, and intelligently. *Lacey*, ¶ 60 (citing *Gittens*, ¶ 14).

¶34 We conclude that Hurlbert was not entitled to a *Miranda* warning prior to being asked for consent to search the vehicle as Hurlbert was not in custody at that time. This Court has repeatedly held that

> "law enforcement officers need not administer *Miranda* warnings to suspects during brief investigative encounters even if those encounters are somewhat coercive. Moreover, we have stated that an interrogation is not custodial unless there is a significant restriction of personal liberty similar to an arrest . . . and even temporary confinement as a safety precaution does not render the detention 'custodial' for *Miranda* purposes . . . ."

*State v. Elison*, 2000 MT 288, ¶ 27, 302 Mont. 228, 14 P.3d 456 (quoting *State v. Dawson*, 1999 MT 171, ¶ 35, 295 Mont. 212, 983 P.2d 916). In *Elison*, we cited with approval the United States Supreme Court's holding in *Berkemer v. McCarty,* 468 U.S. 420, 104 S. Ct. 3138 (1984), that "statements made by a defendant in response to an officer's roadside questioning did not require warnings of constitutional rights because of the brevity of questioning and its public setting, even though few motorists would feel free to leave."[2] *Elison*, ¶ 29 (citing *Berkemer*, 468 U.S. at 436-39, 104 S. Ct. at 3148-49). Thus, "an officer may ask the detainee a moderate number of questions to determine the detainee's identity and to try to obtain information confirming or dispelling the officer's suspicions before the requirements of *Miranda* attach." *Elison*, ¶ 32 (citing *Berkemer*, 468 U.S. at 439, 104 S. Ct. at 3150).

---

[2] Hurlbert raised no challenge to this test.

¶35     In addition, there is no requirement that *Miranda* warnings be given prior to a request for consent to search. *Clark*, ¶ 22 (citation omitted). Consent to search is not an incriminating statement; it is not testimonial or communicative in nature, thus it is not protected by the Fifth Amendment. *United States v. Lemon*, 550 F.2d 467, 472 (9th Cir. 1977).

¶36     Here, the District Court concluded that Hurlbert was in custody after Trooper Nelson told him to leave his keys on the dashboard of the car and exit his vehicle so that Trooper Nelson could search it. Although the State had argued that Hurlbert was still free to leave at that point because he was not in restraints and he was sitting in one of the patrol cars with the door open, we agree with the District Court that Hurlbert was effectively in custody at that time. Hurlbert had limited mobility because of his disability—he could only walk a short distance and he had to use a cane. The District Court pointed out that it was absurd to suggest "that an obviously disabled individual hike down the interstate or through the borrow pit without his vehicle . . . ."

¶37     Notwithstanding, no interrogation took place from the time Hurlbert exited the vehicle until after Trooper Nelson finished searching it. Trooper Nelson was too busy searching the vehicle and Deputy Haggerty was simply standing by keeping an eye on Hurlbert. It was while Trooper Nelson was searching the vehicle that Hurlbert spontaneously stated to Deputy Haggerty that what Trooper Nelson was looking for was in Hurlbert's camo bag. This statement was made voluntarily and not in response to questioning by either officer. The State quite correctly points out that no *Miranda* warnings are required before a defendant spontaneously utters incriminating information.

¶38 As to Trooper Nelson's questioning Hurlbert after Trooper Nelson finished searching the vehicle, both Trooper Nelson and Deputy Haggerty testified that Trooper Nelson advised Hurlbert of his *Miranda* rights before asking Hurlbert any questions about Hurlbert's spontaneous statement to Deputy Haggerty and before asking for Hurlbert's consent to search his personal belongings. Hurlbert, however, denied that he was *ever* advised of his *Miranda* rights.

¶39 After hearing Hurlbert's testimony at the suppression hearing along with the testimony from both law enforcement officers, the District Court concluded that Trooper Nelson and Deputy Haggerty were "forthright, articulate, careful, detailed, and supported their testimony by reference to contemporaneously created notes. Their respective reports of the facts were consistent. Their testimony was credible." As to Hurlbert's testimony, the court stated: "In contrast, [the court] also observed the posture, demeanor, facial expression, tone of voice, delivery, and completeness of responses by [Hurlbert]. All of those indicators in sum demonstrate that [Hurlbert] is not particularly credible."

¶40 The weight of evidence and the credibility of witnesses are exclusively within the province of the trier of fact, and this Court does not reweigh the evidence or the credibility of witnesses. *State v. Pitzer*, 2002 MT 82, ¶ 13, 309 Mont. 285, 46 P.3d 582 (citing *State v. Pierce*, 255 Mont. 378, 383, 842 P.2d 344, 347 (1992)).

> "It is not this Court's function, on appeal, to reweigh conflicting evidence or substitute our evaluation of the evidence for that of the district court. We defer to the district court in cases involving conflicting testimony because we recognize that the court had the benefit of observing the demeanor of witnesses and rendering a determination of the credibility of those witnesses."

13

*Gittens*, ¶ 27 (quoting *Bieber,* ¶ 23).

¶41 Therefore, we defer to the District Court's determination that both Trooper Nelson's and Deputy Haggerty's testimony was more credible than Hurlbert's testimony, and we hold that Hurlbert was properly advised of his *Miranda* rights prior to any custodial interrogation by law enforcement officers.

**Issue 4.**

¶42 *Whether Hurlbert's consent to search his belongings was given voluntarily.*

¶43 The District Court determined that Hurlbert freely and voluntarily gave his consent based on the following facts: Hurlbert was given a *Miranda* warning before he was asked for consent to search his personal belongings; he volunteered to answer questions; he was given a written consent form which he signed; and he admitted to reading the bottom portion of the form containing critical language affirming his free and voluntary consent. Even though the District Court found that there is always an inherent risk of coercion in a situation where an individual is not free to go, the District Court concluded that the other facts taken together demonstrate that Hurlbert freely and voluntarily consented to the search of his personal belongings. The District Court also determined that Hurlbert's claim that he didn't know what he had signed was "[t]o avoid the impact of his signature on the consent form" and that his testimony is "inconsistent with his acknowledgment that he may refuse entirely or stop at anytime."

¶44 Hurlbert contends that his consent to search his personal belongings was not valid because it was not given freely and voluntarily. Hurlbert claims he "eventually consented to the search of his personal belonging[s], because he perceived that he had no other

14

choice, and was being forced to do so." He also claims that he signed the permission to search form *after* the search thinking that it was actually an inventory of what was in the vehicle. We conclude that Hurlbert's contentions are disingenuous and we agree with the District Court's determination that Hurlbert freely and voluntarily gave his consent to search his personal belongings.

¶45 As noted earlier in this Opinion, warrantless searches are per se unreasonable, subject only to a few carefully drawn exceptions. *Clark*, ¶ 22 (citing *Bieber*, ¶ 29). "One such exception 'arises when a citizen has knowledgeably and voluntarily consented to a search.' " *Clark*, ¶ 22 (quoting *Bieber*, ¶ 29). Moreover, the prosecution carries the burden of establishing that consent to a warrantless search was freely and voluntarily given and was uncontaminated by any express or implied coercion. *Munson*, ¶ 50 (citing *State v. Olson*, 2002 MT 211, ¶ 20, 311 Mont. 270, 55 P.3d 935; *State v. Rushton*, 264 Mont. 248, 257-58, 870 P.2d 1355, 1361 (1994)).

¶46 This Court has adopted the United States Supreme Court's totality-of-the-circumstances test for determining whether consent was given freely, voluntarily and without duress or coercion. *Munson*, ¶ 51 (citing *Wetzel,* ¶ 16; *Rushton,* 264 Mont. at 257-58, 870 P.2d at 1361; *Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 227, 248-49, 93 S. Ct. 2041, 2047, 2048, 2059 (1973)). A number of questions are pertinent to this inquiry, such as whether they were in custody or under arrest at the time consent was requested; whether consent was sought after the search had already been conducted; whether they were expressly informed that they had the right not to consent to the search; whether they were told that a search warrant could be obtained; whether they were

advised of their constitutional rights; and whether they were threatened or coerced in any manner. *Munson*, ¶ 51 (citing *Wetzel*, ¶ 17; *Schneckloth*, 412 U.S. at 226, 93 S. Ct. at 2047; *United States v. Patayan Soriano*, 361 F.3d 494, 502 (9th Cir. 2004)). Also pertinent to the inquiry is information regarding the repeated and prolonged nature of the questioning, and their age, education, and intelligence. *Munson*, ¶ 51.

¶47 One factor in this totality-of-the-circumstances test is whether the accused were advised of their *Miranda* rights. However, there is no requirement that *Miranda* warnings be given prior to a request for consent to search. *Clark*, ¶ 22. In the end, the determination of whether consent was given freely, voluntarily, and without duress or coercion depends on the totality of all the surrounding facts, and no single fact is dispositive. *Munson*, ¶ 51 (citing *State v. Copelton*, 2006 MT 182, ¶ 19, 333 Mont. 91, 140 P.3d 1074).

¶48 The following facts support the District Court's determination that Hurlbert's consent was given voluntarily. While sitting in the back of Deputy Haggerty's patrol car, Hurlbert spontaneously admitted to Deputy Haggerty that there was a blue box, which contained a spoon and a syringe, in his camo bag. Based on this information, Trooper Nelson asked Hurlbert to sign a form consenting to a search of his personal belongings, specifically including the "camo fanny pack." Hurlbert signed the form, which was entitled at the top in bold, capital letters "**PERMISSION TO SEARCH AND SEIZE**." The form specifically stated at the bottom "I am giving this written permission to these officers freely and voluntarily, without any threats or promises having been made, and after having been informed by said officer that I have a right to refuse this search and or

16

seizure, and to stop such search at any time." Trooper Nelson wrote "camo fanny pack" on the form as an item to be searched. In addition, Hurlbert was given a *Miranda* warning before Trooper Nelson asked him any questions regarding his personal belongings and before Trooper Nelson asked him to sign the consent to search form. Both Deputy Haggerty and Trooper Nelson testified that Hurlbert was not under any sort of duress either at the time he spontaneously admitted that his bag contained contraband or at the time he signed the form consenting to the search of his personal belongings.

¶49 While a few facts point to the possibility that Hurlbert's consent was not voluntary, including the District Court's determination that Hurlbert was not free to leave during the latter part of the stop, the fact that the officers were both armed (although no weapons were ever drawn), and the fact that Hurlbert testified that Trooper Nelson told him he could obtain a search warrant for the search if necessary, the overwhelming evidence demonstrates that Hurlbert's consent to search his personal belongings was given freely and voluntarily.

¶50 Accordingly, we agree with the District Court's determination that Hurlbert freely and voluntarily gave his consent to search his personal belongings.

## CONCLUSION

¶51 Based on the foregoing, we hold that the District Court did not err in denying Hurlbert's motion to suppress.

¶52 Affirmed.

/S/ JAMES C. NELSON

17

We Concur:

/S/ W. WILLIAM LEAPHART
/S/ PATRICIA COTTER
/S/ JOHN WARNER
/S/ JIM RICE