05-725

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2007 MT 222

STATE OF MONTANA,

        Plaintiff and Respondent,

  v.

JULIA MUNSON,

        Defendant and Appellant.

APPEAL FROM:    District Court of the Twenty-First Judicial District,
                In and For the County of Ravalli, Cause No. DC 2005-51
                Honorable James A. Haynes, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

      Keithi M. Worthington, Worthington Law Office, PLLC, Hamilton, Montana

      For Respondent:

      Hon. Mike McGrath, Montana Attorney General, Jim Wheelis,
      Assistant Attorney General, Helena, Montana

      George Corn, Ravalli County Attorney, William Fulbright,
      Deputy County Attorney, Hamilton, Montana

                     Submitted on Briefs:  August 30, 2006

                             Decided:  September 5, 2007

Filed:

               _____
                       Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 Julia Munson ("Munson") appeals from the order of the District Court for the Twenty-First Judicial District, Ravalli County, denying her motion to suppress statements and evidence related to her prosecution for criminal possession of dangerous drugs, criminal endangerment, and criminal possession of drug paraphernalia. We reverse.

¶2 The issues on appeal are as follows:

1. Did the District Court err in denying Munson's motion to suppress statements she made to law enforcement officers?

2. Did the District Court err in denying Munson's motion to suppress evidence seized from her apartment and vehicle?

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 On the evening of March 14, 2005, law enforcement officers responded to a report of underage drinking at Munson's apartment in Corvallis, Montana. Outside Munson's apartment, the officers encountered George Snell, who appeared to be under the influence of methamphetamine. They discovered that Snell was on probation, interviewed him, and placed him under arrest. During an interview following his arrest, Snell alleged that he had seen evidence of methamphetamine use in Munson's apartment.

¶4 At approximately 3:00 p.m. the following day (March 15, 2005), Detectives Jason Basnaw and Perry Johnson of the Ravalli County Sheriff's Office (collectively, "the Officers") went to Munson's apartment building to follow up on Snell's allegation. The ensuing events were tape-recorded by the Officers, and a transcript of that recording is part of the record on appeal.

2

¶5     The Officers knocked on Munson's door.  Munson's five-year-old son, Chase, opened the door and left it open while he went to get Munson.  Standing at the doorway, Basnaw saw what he thought might be paraphernalia for the packaging of methamphetamine or small amounts of dangerous drugs in the living room.  When Munson came to the door, Basnaw told her that he would "[l]ike to visit with ya' for a minute if we could" "about uh, that situation last night with Geroge Snell over here."  Johnson asked Munson if he and Basnaw could come in, but Munson responded that "actually my daughter's, I'm just puttin' her down for a nap can you come back ---------?"  Basnaw declined, stating:  "Well actually I don't have time.  Um, I need to visit with ya' right now."  Munson then let the Officers into the apartment.

¶6     Basnaw asked Munson if she had had any methamphetamine in the apartment the previous night and if she had any drugs in the apartment at present.  Munson replied "No" to both questions.  Basnaw then asked if Munson would consent to a search of the apartment.  Munson twice replied, "No."  Next, Johnson asked Munson if she would consent to a search of her body.  Munson again said, "No."  Johnson asked Munson why she wouldn't give the Officers a urine sample and why she wouldn't allow them to search her home, and Munson explained, "Because George [Snell] doesn't hang out here or nothin', you know, I don't even hardly know him," and because "I just don't fell [sic] that it's right."

¶7     At this point, Johnson, who knew Munson when she was a young girl and also knew Munson's father in his (Johnson's) "professional capacity," began questioning Munson about her lifestyle.  He stated that he was "really proud" of her father because "once he got his arms around whatever problems he had he got on with the rest of his life."  Johnson told Munson

3

that "I want you to get on with the rest o' your life and I don't want ya' to do what you're doin'." He opined that she was at "a fork in the road" and stated that he wanted her to "choose wisely." Johnson also stated, "I know that, that you're worried about what we're gonna' find if we shake your house down"; thus, he told Munson that he and Basnaw were not there "to threaten ya' or to beat ya' up or any o' that."

¶8     Johnson asked Munson, "How do you suggest that we resolve this? Are you lookin' for some help? You wanta' get on with it or do you wanta' keep goin' the way you been goin'?" Munson replied, "No I don't." Johnson inquired, "If you wanted to uh, if you wanted to quit right now the, the way you've been livin' and change your life how would you do that?" Munson replied, "I don't know." Johnson asked whether Munson thought she needed rehab and whether her parents might help her, at which point the transcript reflects that Munson was crying. The following dialogue then ensued:

> *Detective Johnson:*     Here's what I, I want you to know this. Here's what we didn't come here and do. We didn't come here and take that Miranda card out and tell you this. You have the right to remain silent and all o' that stuff. Right? And we didn't come here to threaten ya' or talk mean to ya'. We came here because we're both dads and neither one of us guys is perfect I'll tell ya' that. And, and you know, we don't live right next door to ya' but this community's so small Julia we're still neighbors.
> *Julia Munson:*          I know hhh.
> *Detective Johnson:*     And what affects you affects us and that's why the Sherriff's were [sic] last night 'cause that affected us. So is there some way that, that we can help you?
> *Julia Munson:*          I'm sure there is but I don't know ------------ hhh.
> *Detective Johnson:*     'Kay. Well let's talk about your kids then for a minute. You wanta' raise 'em?
> *Julia Munson:*          Yes.
> *Detective Johnson:*     Do you think this is the way to do it?
> *Julia Munson:*          Um, hmm. (Affirmative)

*Detective Johnson:* Well then how ya' gonna', how ya' gonna' manage that?

*Julia Munson:* ------------

*Detective Johnson:* 'Kay. Well I agree with ya'. I don't think this is the way to raise 'em either. You know, worried about who's knockin' at the door, havin' 'em spend their time over at the neighbor's place. I'd sure rather see 'em bein' held by their mom and her getting 'em to kindergarten and stuff like that. Chase go to kindergarten yet?

*Julia Munson:* Yeah.

*Detective Johnson:* Yeah? Goes in the morning or what?

*Julia Munson:* Yeah in the morning.

*Detective Johnson:* Yeah? You take him or does he just walk down there himself?

*Julia Munson:* I take him.

*Detective Johnson:* Do ya'? 'Kay. So have you got crank in this house?

*Julia Munson:* No.

*Detective Johnson:* How come we can't search it then?

*Julia Munson:* 'Cause.

*Detective Johnson:* 'Cause why?

*Julia Munson:* I have paraphernalia . . . .

Munson also admitted that she had used methamphetamine during the previous twenty-four hours. Thereafter, Johnson stated that "we want that stuff and that's why we came"; however, Munson insisted, again, that she didn't have any. Significantly, the Officers did not advise Munson of her rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966), before or at any point during this exchange.

¶9 Despite the fact that Munson had neither consented to a search of her home nor been informed of her right to refuse to consent to a search of her home, Basnaw then presented Munson with a Consent to Search form. Basnaw explained that the form "just says that your, you're uh, having been informed of your right to refuse a search of your um, of your house," you "authorize the above member of Ravalli County Sheriff's Office to remove any letters, documents, papers, materials or other property which are considered pertinent to the

5

investigation." In this regard, Basnaw stated that he was "concerned about meth and meth paraphernalia. Um, anything having to do with meth." Lastly, Basnaw indicated that by signing the form, Munson would be "knowingly and voluntarily giv[ing] [her] consent to search."

¶10 Munson asked whether signing the Consent to Search form gave the Officers permission to search her whole apartment. Johnson answered affirmatively. Munson then indicated that she would retrieve the paraphernalia for them, and she reiterated that there was no methamphetamine in the apartment for them to find. Therefore, Munson asked, "I have to sign this?" to which Johnson replied, "Yeah. But here's why." Johnson then stated:

*Detective Johnson:* Is because you have the right to refuse and what Jase [Basnaw] just told ya' I believe but I need to make sure that you believe it. We're not gonna' go and open your refrigerator. We're not gonna' look at your underwear. We're not gonna' do that stuff. But here's what we will do. When you leave this room…
*Julia Munson:* Um, hmm. (Affirmative)
*Detective Johnson:* …we'll follow you.
*Julia Munson:* Um, hmm. (Affirmative)
*Detective Johnson:* 'Kay? And, and that's because we do have a family.
*Julia Munson:* Right.
*Detective Johnson:* And because some people wanta' hurt us. 'Kay? So that's what the deal is. We're not gonna' toss your house.
*Julia Munson:* Okay. Hhhh.
*Detective Johnson:* But we still need to, to know that you understand that you don't have to sign that. And if you sign it you're doing it voluntarily.
*Julia Munson:* And so if I don't sign it I can't even take you to the paraphernalia?
*Detective Johnson:* Right, right. If you don't sign it here's what happens. We're gonna' get up and we're gonna' go out that door. We're gonna' leave.
*Julia Munson:* (Cough)
*Detective Johnson:* And this is the deal Julia. This is the fork in the road. And today you're gonna' decide where you're gonna' be tomorrow and, and to be real honest with ya' today is March 15th. The decision you make today is gonna' determine where your children are raised.

6

*Julia Munson:*       (Sniff)

Munson then signed the form.

¶11    Munson and the Officers walked through the apartment, and she pointed out various pieces of paraphernalia, including a glass pipe with white residue, a Ziploc bag with white residue, two bongs, a glass vial, and five pill capsules. After the Officers had completed the search of Munson's apartment, they advised her of her *Miranda* rights. Basnaw also conducted a search of Munson's vehicle at some point during this period.

¶12    Munson started crying again and became upset when, having been under the impression that she would only be issued a citation for having the paraphernalia, Basnaw told her that he was going to arrest her, that someone would have to come and be with her children, and that the Department of Family Services would probably become involved. Munson called her father to take the children, and the Officers placed her under arrest. According to the transcript, Basnaw terminated the interview at "16:45," which indicates that the Officers were at Munson's apartment building for approximately one hour and forty-five minutes.

¶13    On March 28, 2005, the State charged Munson with criminal possession of dangerous drugs (methamphetamine), a felony, in violation of § 45-9-102(1), (5), MCA, criminal endangerment, a felony, in violation of § 45-5-207(1), MCA, and criminal possession of drug paraphernalia, a misdemeanor, in violation of § 45-10-103, MCA.

¶14    Munson filed a motion to suppress "any and all statements" she had made to the Officers on the ground that she had been "interrogated while in custody without first being advised of her constitutional rights as required by [*Miranda*]." She argued that her "freedom

7

was significantly restricted by the detectives" and that "the detectives . . . persisted in their questioning until they forced Munson to make incriminating statements." Munson also moved to suppress "any and all evidence" collected from her person, residence, and automobile "because the consent to search was not given freely and voluntarily as required by [*Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S. Ct. 2041 (1973)]." She contended that "[t]he totality of the circumstances of the case at hand reveal that [her] consent to search was . . . the product of coercive and lengthy interrogation tactics."

¶15 The State filed a response, Munson filed a reply, and the District Court held a suppression hearing. On September 13, 2005, the District Court issued an order denying Munson's motion. With respect to Munson's statements, the District Court concluded that the six considerations listed in *State v. Olson*, 2003 MT 61, ¶ 15, 314 Mont. 402, ¶ 15, 66 P.3d 297, ¶ 15, each weighed in favor of the State and that Munson, therefore, had not been subjected to a custodial interrogation. With respect to the evidence seized from Munson's apartment and automobile, the court reasoned that Munson had been advised that she did not have to sign the consent form, that the Officers had not made Munson any promises before she signed the form, and that she had knowingly and voluntarily consented to the search.

¶16 Thereafter, the State filed an amended information, deleting the charge of criminal endangerment but retaining the charges of criminal possession of dangerous drugs and criminal possession of drug paraphernalia. Munson entered into a plea agreement and pleaded no contest to both charges; however, she specifically reserved her right to appeal the denial of her motion to suppress. The District Court entered judgment on November 3, 2005,

8

sentencing Munson to five years with the Department of Corrections, all suspended, and a concurrent six-month term in the Ravalli County Detention Center, also suspended.

¶17 Munson now appeals from the District Court's order denying her motion to suppress.

**STANDARD OF REVIEW**

¶18 In reviewing a district court's ruling on a motion to suppress evidence or statements, we determine whether the court's underlying factual findings are clearly erroneous and whether the court's interpretation and application of the law are correct. *State v. Copelton*, 2006 MT 182, ¶ 8, 333 Mont. 91, ¶ 8, 140 P.3d 1074, ¶ 8; *State v. Bassett*, 1999 MT 109, ¶ 17, 294 Mont. 327, ¶ 17, 982 P.2d 410, ¶ 17; *State v. Loh*, 275 Mont. 460, 475, 914 P.2d 592, 601 (1996). The court's findings of fact are clearly erroneous if they are not supported by substantial credible evidence, if the court has misapprehended the effect of the evidence, or if our review of the record leaves us with a definite or firm conviction that a mistake has been made. *State v. DeWitt*, 2004 MT 317, ¶ 21, 324 Mont. 39, ¶ 21, 101 P.3d 277, ¶ 21; *Loh*, 275 Mont. at 475, 914 P.2d at 601.

**DISCUSSION**

¶19 *Issue 1. Did the District Court err in denying Munson's motion to suppress statements she made to the Officers?*

¶20 The Fifth Amendment to the United States Constitution and Article II, Section 25 of the Montana Constitution provide that no person shall be compelled in a criminal proceeding to testify or be a witness against himself or herself. We discussed this privilege against self-incrimination in *State v. Olson*, 2003 MT 61, 314 Mont. 402, 66 P.3d 297, explaining that

9

the prosecution may not use statements that stem from a custodial interrogation of a defendant unless the defendant is warned, prior to questioning, that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney. [*Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612 (1966).] These "warnings" are often referred to as *Miranda* warnings.

*Olson*, ¶ 13; *accord State v. Reavley*, 2003 MT 298, ¶ 17, 318 Mont. 150, ¶ 17, 79 P.3d 270, ¶ 17; *State v. Wrzesinski*, 2006 MT 263, ¶ 29, 334 Mont. 157, ¶ 29, 145 P.3d 985, ¶ 29; *see also Missouri v. Seibert*, 542 U.S. 600, 608, 124 S. Ct. 2601, 2608 (2004) (Opinion of Souter, J.) ("[F]ailure to give the prescribed warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained."); *State v. Grey*, 274 Mont. 206, 211-14, 907 P.2d 951, 954-56 (1995) (holding that Grey's confession was inadmissible due in part to the fact that the police had not given him adequate *Miranda* warnings). Accordingly, if Munson was subject to a "custodial interrogation," then she was entitled to the *Miranda* warnings before the Officers questioned her, and because Munson indisputably did not receive those warnings, her statements could not be used by the State in prosecuting her.

¶21 There are two separate components to the "custodial interrogation" determination: (1) whether the individual was "in custody" and (2) whether the individual was subjected to an "interrogation." *See Rhode Island v. Innis*, 446 U.S. 291, 299-301, 100 S. Ct. 1682, 1689 (1980); *Illinois v. Perkins*, 496 U.S. 292, 297, 110 S. Ct. 2394, 2397 (1990). With respect to the former, a person is "in custody" for purposes of *Miranda* "if they have been deprived of their freedom of action in any significant way or their freedom of action has been curtailed to a degree associated with a formal arrest." *State v. Elison*, 2000 MT 288, ¶ 27, 302 Mont.

10

228, ¶ 27, 14 P.3d 456, ¶ 27 (citing *State v. Dawson*, 1999 MT 171, ¶ 30, 295 Mont. 212, ¶ 30, 983 P.2d 916, ¶ 30, in turn quoting *United States v. Ritchie*, 35 F.3d 1477, 1485 (10th Cir. 1994)). The determination of custody depends on the objective circumstances of the questioning, not on the subjective views harbored by the officer(s) and the individual being questioned. *See Evans v. Montana Eleventh Judicial Dist. Court*, 2000 MT 38, ¶ 21, 298 Mont. 279, ¶ 21, 995 P.2d 455, ¶ 21; *Stansbury v. California*, 511 U.S. 318, 323, 114 S. Ct. 1526, 1529 (1994) (per curiam). Thus, an officer's undisclosed view that the individual may (or may not) terminate the interview and leave has no bearing on the question whether the individual was in custody at the time; rather, the only relevant inquiry is how a reasonable person in the individual's position would have understood his or her situation. *See Elison*, ¶ 31; *Evans*, ¶ 21; *see also Stansbury*, 511 U.S. at 323-25, 114 S. Ct. at 1529-30; *Berkemer v. McCarty*, 468 U.S. 420, 441-42, 104 S. Ct. 3138, 3151 (1984).

¶22     The Supreme Court has articulated "[t]wo discrete inquiries" that are essential to the "in custody" determination:

> first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: [was] there a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.

*Thompson v. Keohane*, 516 U.S. 99, 112, 116 S. Ct. 457, 465 (1995) (alteration in original, footnote and internal quotation marks omitted).

¶23     The federal courts have identified a variety of circumstances that are pertinent to the first inquiry, including the language used by the officers; the location or physical

11

surroundings where the questioning occurs; whether the individual consented to speak with the officers; the degree of pressure applied to detain the individual; whether the individual was moved to another area; whether the officers informed the individual that he or she was not under arrest and was free to leave or could ask the officers to leave; whether there was a threatening presence of several officers; whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical force; the duration of the detention; and the extent to which the individual was confronted with evidence of guilt. *See United States v. Hernandez*, 476 F.3d 791, 796 (9th Cir. 2007); *United States v. Barker*, 467 F.3d 625, 629 (7th Cir. 2006); *United States v. Willaman*, 437 F.3d 354, 359-60 (3rd Cir. 2006); *United States v. Czichray*, 378 F.3d 822, 827 (8th Cir. 2004); *United States v. Salvo*, 133 F.3d 943, 950 (6th Cir. 1998); *see also Yarborough v. Alvarado*, 541 U.S. 652, 663-65, 124 S. Ct. 2140, 2149-50 (2004). We have recognized some of these same considerations. *See e.g. Elison*, ¶ 28 (identifying "the time and place of the questioning, the length and mood of the questioning, and the presence of other persons during the questioning" as relevant considerations); *State v. Rushton*, 264 Mont. 248, 256, 870 P.2d 1355, 1360 (1994) (same), *overruled in part on other grounds*, *State v. Hermes*, 273 Mont. 446, 449, 904 P.2d 587, 589 (1995).[1]

---

[1] Some of our cases also refer to "whether *Miranda* warnings were gratuitously given." *See e.g. State v. Lapp*, 202 Mont. 327, 331, 658 P.2d 400, 403 (1983); *State v. Osteen*, 216 Mont. 258, 265, 700 P.2d 188, 193 (1985); *State v. Staat*, 251 Mont. 1, 6, 822 P.2d 643, 646 (1991); *Evans*, ¶ 19; *Olson*, ¶ 15; *Reavley*, ¶ 19; *State v. McKee*, 2006 MT 5, ¶ 28, 330 Mont. 249, ¶ 28, 127 P.3d 445, ¶ 28; *In re Z.M.*, 2007 MT 122, ¶ 42, 337 Mont. 278, ¶ 42, 160 P.3d 490, ¶ 42. This and the other considerations set forth in *Elison* and *Rushton* derive from *Cummings v. State*, 341 A.2d 294 (Md.App. 1975). *See Lapp*, 202 Mont. at 331, 658 P.2d at 403 (citing *Cummings*, 341 A.2d at 300-05). We note, however,

¶24    None of the foregoing circumstances is dispositive. *See Czichray*, 378 F.3d at 827

("When the factors are invoked, it is important to recall that they are not by any means

exclusive, and that 'custody' cannot be resolved merely by counting up the number of factors

on each side of the balance and rendering a decision accordingly."). Rather, they must be

considered together in determining whether "a reasonable person [would] have felt he or she

was not at liberty to terminate the interrogation and leave." *Thompson*, 516 U.S. at 112, 116

S. Ct. at 465; *see also Elison*, ¶ 28 ("[W]hile consideration of these factors might be useful,

the ultimate inquiry is . . . whether there was a formal arrest or restraint on freedom of

movement of the degree associated with a formal arrest." (internal quotation marks omitted)).

¶25    With respect to "interrogation" under *Miranda*, this term "refers not only to express

questioning, but also to 'any words or actions on the part of the police (other than those

normally attendant to arrest and custody) that the police should know are reasonably likely to

elicit an incriminating response from the suspect.' " *Olson*, ¶ 18 (quoting *State v. Flack*, 260

Mont. 181, 186, 860 P.2d 89, 92 (1993), in turn quoting *Innis*, 446 U.S. at 301, 100 S. Ct. at

1689-90); *accord In re Z.M.*, 2007 MT 122, ¶ 42, 337 Mont. 278, ¶ 42, 160 P.3d 490, ¶ 42;

*State v. McKee*, 2006 MT 5, ¶ 31, 330 Mont. 249, ¶ 31, 127 P.3d 445, ¶ 31. The primary

---

that the point the Maryland court was making with respect to the gratuitous giving of *Miranda* warnings was not that the gratuitousness of the warnings informs whether the suspect was "in custody." Rather, the court's point was that "the gratuitous and unnecessary giving of *Miranda* warnings will [not] operate to convert an otherwise noncustodial situation into a custodial one." *Cummings*, 341 A.2d at 304. Thus, to clarify the relevance of this consideration in this and future cases, the fact that the officer gave *Miranda* warnings during the course of the encounter may be considered in determining whether the individual was in custody; however, if all other considerations dictate that the individual was not in custody, the fact that *Miranda* warnings were given will not by itself convert the otherwise noncustodial situation into a custodial one.

13

focus in determining whether an incriminating response was reasonably likely to be elicited from the suspect is on the perceptions of the suspect, rather than on the intent of the police. *Olson*, ¶ 18; *Z.M.*, ¶ 42; *McKee*, ¶ 31.

¶26 With these principles in mind, we now consider the circumstances surrounding the Officers' visit to Munson's apartment and whether those circumstances amount to a custodial interrogation.

### Custody

¶27 We begin with the question of whether Munson was "in custody." There are circumstances here that weigh on each side of this question. On one hand, the State points out that Munson was interviewed in her home during the middle of the afternoon, as opposed to being dragged out of bed and down to the police station in the middle of the night. Furthermore, the State suggests that "Johnson's use of his history with her family and his attempt to persuade her to cooperate were not threatening and appeared to be sincere." We also note here that the Officers wore plain clothes, did not display any weapons, and did not use physical force to coerce incriminating statements from Munson.

¶28 On the other hand, there are a substantial number of circumstances which indicate that Munson was in custody. Although the Officers met with Munson in her home,

> it is not difficult to envision that a suspect's sense of captivity can actually be intensified by the intrusive and intimidating environment created when agents of the law take control of a person's private residence. After all, a person can not reasonably expect to be free anywhere if not within the refuge of his home.

*United States v. Griffin*, 922 F.2d 1343, 1355 n. 15 (8th Cir. 1990). Indeed, in *State v. Osteen*, 216 Mont. 258, 700 P.2d 188 (1985), we explained that "[i]t is not necessary that

14

interrogation occur at the police station in order to invoke the *Miranda* requirements. Interrogation which occurs in the suspect's home is subject to *Miranda* where it occurs in a coercive environment in which the suspect's freedom of action has been significantly restricted." *Osteen*, 216 Mont. at 265, 700 P.2d at 193, *overruled in part on other grounds*, *State v. Loh*, 275 Mont. 460, 472, 473, 914 P.2d 592, 599, 600 (1996).

¶29　Here, when the Officers arrived at Munson's apartment and initially addressed her, they did not convey that speaking with them was optional; to the contrary, Basnaw told Munson that he did not have time to come back and that he needed to visit with her "right now." Basnaw then told Munson that he and Johnson were there to "follow up" on information that methamphetamine was presently, or had been the night before, in Munson's apartment. The two officers then questioned Munson in tandem. During the course of the questioning, Munson sat on a couch, Johnson sat on a piece of furniture (another couch or a coffee table) three or four feet in front of her, and Basnaw alternated between standing, sitting, and kneeling near Munson while maintaining a distance of three to six feet. Meanwhile, Munson's infant daughter was napping and Munson's five-year-old son was alternately in and out of the apartment. Under these circumstances, Munson was not free to leave her apartment; rather, she was compelled to remain there. Indeed, Johnson acknowledged at the suppression hearing, "She couldn't get up and leave. We would have had to."

¶30　In this regard, Basnaw testified that "[Munson] could've asked us to leave, and we would've left, and she would've been there by herself." Yet, this fact was not conveyed to Munson during the interview, and an officer's undisclosed view that the individual may

15

terminate the interview and ask the officers to leave has no bearing on the question whether the individual was in custody. *See Elison*, ¶ 31; *Evans*, ¶ 21; *cf. Berkemer*, 468 U.S. at 441-42, 104 S. Ct. at 3151. Moreover, by their words and their actions, the Officers actually conveyed that they were determined to investigate the allegations of criminal activity in Munson's apartment and would not leave until they had done so. In particular, Johnson asked upon arriving, "Can we come in Julia?" and Munson replied, "Um, actually my daughter's, I'm just puttin' her down for a nap can you come back ---------?" Basnaw declined, stating: "Well actually I don't have time. Um, I need to visit with ya' right now." Next, Basnaw asked Munson if she had had any methamphetamine in the apartment the previous night. Munson replied, "No." Basnaw asked her if she had any drugs in the apartment at present. Munson replied, "No." Basnaw asked Munson if she would consent to a search of the apartment. Munson replied, "No." Johnson cut in at this point and asked Munson if she would consent to a search of her body and if she would give them a urine sample. Munson replied, "No." Nevertheless, Johnson persisted:

*Detective Johnson:* Why not?
*Julia Munson:* Because.
*Detective Johnson:* 'Kay. And why wouldn't you allow us to search your home?
*Julia Munson:* Because George [Snell] doesn't hang out here or nothin', you know, I don't even hardly know him. I know Josh.
*Detective Johnson:* Uh, huh. (Affirmative)
*Julia Munson:* And I just don't fell [sic] that it's right.

This dialogue occurred within the first few minutes of the Officers' arrival at the apartment. Yet, notwithstanding Munson's unequivocal assertions that there were no drugs in the apartment, that she would not consent to searches of the apartment or her body, and that she

16

did not want to speak with the Officers at that time, the Officers remained in her apartment and pressed on with the interview.[2]

¶31 Given the Officers' persistence, it is hardly surprising that Munson felt, as she later testified at the suppression hearing, that "until they either got what they wanted to hear or what they wanted to find they would not leave my home." It is also unsurprising, given Basnaw's statement that he needed to speak with Munson "right now" and the fact that she had an infant napping in the apartment, that she felt she was not free to terminate the interview and leave. In light of what the Officers stated to Munson and the other circumstances surrounding the interview, we conclude that a significant degree of pressure was applied by the Officers to detain Munson. For this reason, we cannot agree with the District Court that "[t]here was no restriction on Munson's liberty."

¶32 Likewise, we cannot agree with the District Court that Munson "invited the officers into her home to talk." To the contrary, the record reflects that Munson asked the Officers if they could come back, since she was just putting her daughter down for a nap. It was only when the Officers refused that Munson acquiesced to their entry. Notably, the Officers did not inform Munson that she could refuse to let them in.

¶33 Lastly, we note that the Officers stated unequivocally to Munson at the outset of their visit that they were there to "follow up" on allegations of criminal activity involving Munson

---

[2] That the Officers were determined to investigate the allegations of criminal activity in Munson's apartment and would not leave until they had done so is confirmed by Basnaw's and Johnson's respective testimony to this effect at the suppression hearing. Also, Basnaw explained at the hearing that it is "fairly common" after an individual has refused consent for him to sit and talk with the individual about the individual's family and lifestyle in an effort to obtain the consent previously refused.

17

and her apartment—in particular, Snell's allegations of methamphetamine use there. Yet, at no point did the Officers inform Munson that she was not under arrest, that she was free to leave, or that they would terminate the interview and leave upon her request.

¶34   In light of the foregoing circumstances, we conclude that the Officers created a custodial atmosphere and that "[Munson's] freedom of action [was] significantly restricted," *Osteen*, 216 Mont. at 265, 700 P.2d at 193.

¶35   We reached this same conclusion with respect to the interviews at issue in *Osteen* and *Rushton*. In *Osteen*, we noted the following circumstances surrounding the officers' visit to the defendant's home:

> Here, two armed and uniformed police officers appeared at defendant's door at night and sought entry. Meanwhile, another officer and the alleged victim waited in a vehicle outside defendant's home. The two officers entered defendant's home without a warrant or other authorization, and began to interrogate the defendant regarding the weapon, his vehicle and his activities that night. The defendant was alone in his home at the time. The questioning apparently exceeded ten minutes in length. The officers repeated their questioning until receiving satisfactory answers. Both officers testified that, at first, the defendant denied having the gun in his car that night. After additional questioning, the defendant admitted the gun was with him in the car and he was formally arrested.

*Osteen*, 216 Mont. at 265, 700 P.2d at 193. We held that "[t]hese facts establish that the defendant was significantly deprived of his freedom of action." *Osteen*, 216 Mont. at 265, 700 P.2d at 193.

¶36   Similarly, we noted the following circumstances in *Rushton*:

> Here, two armed officers were in defendant's home late at night after arousing him from bed. When Detective Bailey and the other officers went to defendant's home, it is clear that they suspected defendant of criminal activity. Moreover, the officers specifically intended to obtain defendant's consent to conduct a search of his home because, for administrative reasons only, they did

18

not attempt to get a warrant. Defendant was not told why the officers wanted to talk with him, nor that he had the right to refuse them entry. Although defendant quickly put on some clothes, his wife was dressed only in a robe and pajamas during the time they were questioned by Detective Bailey. Furthermore, after the Rushtons were told to sit on the couch, a second armed officer remained standing and blocked the exit from the room. Defendant testified that he did not feel he was free to leave and the officers present admitted their intention to stop and detain anyone who attempted to leave.

*Rushton*, 264 Mont. at 256, 870 P.2d at 1360. On these facts, we concluded that "a person in defendant's position could reasonably believe that his freedom was restricted and he was not free to leave." *Rushton*, 264 Mont. at 256, 870 P.2d at 1360.

¶37 The State asserts that *Osteen* and *Rushton* are distinguishable from Munson's situation. Yet, with respect to *Osteen*, the State identifies a number of similarities, rather than differences. For instance, the State observes that "[t]he officers [in *Osteen*] had sufficient information for a warrant, but chose not to obtain one." The same appears to be true here, given the information the Officers had received from Snell in conjunction with Basnaw's personal observations, while standing in Munson's doorway, of what he thought might be "paraphernalia for the packaging of methamphetamine or small amounts of dangerous drugs" and Basnaw's reaction, upon entering Munson's apartment, to the presence of methamphetamine, including "[t]he odor" and his "scratchy throat." The State further observes that in *Osteen*, "[the officers] did not tell Osteen that he had a right to refuse entry . . . , and they entered Osteen's home without a warrant or other authorization"—both of which are also true here. Other similarities abound. In both *Osteen* and the case at hand, two officers began questioning the defendant upon entering the home. Osteen was alone at the time, as was Munson for all intents and purposes (Munson's infant daughter was napping and

19

Munson's five-year-old son was alternately in and out of the apartment). The questioning in both cases exceeded ten minutes; and, most notably, the officers in both cases repeated their questions until they received the answers they wanted. Although in *Osteen*, the officers were armed and uniformed and appeared at Osteen's door at night, whereas here the Officers wore plain clothes, did not display any weapons, and appeared at Munson's door in the middle of the afternoon, we do not find these distinctions to be as significant as the similarities.

¶38 With respect to *Rushton*, the State argues that "Rushton was faced with a more intimidating set of facts." In particular, whereas Rushton was rousted from bed at night, Munson was visited during the afternoon, and whereas an armed officer blocked the exit from the room where Rushton was interviewed, Munson allegedly "was free to make conscious decisions." We do not agree, however, that Munson's situation was necessarily less "intimidating" or that her decision-making ability was significantly less influenced. Whereas Rushton was interviewed in the company of his wife, Munson was questioned while she was, for all intents and purposes, alone in the apartment with two male officers, one of whom she "kind of" recognized (Johnson) and one of whom she did not know (Basnaw). Furthermore, according to Munson, the Officers' presence and physical appearance were, from her perspective, "intimidating." (Munson was 5 feet, 2 inches tall and weighed 110 pounds at the time.) And although an armed officer did not block the exit, the Officers effectively cornered Munson on a couch in her apartment, with Johnson sitting three or four feet in front of her, with Basnaw alternating between standing, sitting, and kneeling within three to six feet of her, and with both officers questioning her in tandem and without respite.

20

¶39 But even if we could agree with the State that the facts faced by Rushton were "more intimidating" than the facts faced by Munson, we have never said that an individual must be subjected to factual circumstances at least as "intimidating" as those in *Rushton* in order to be "in custody." To the contrary, we have stated that this Court considers each case "on a case-by-case basis," focusing on whether a reasonable person in the defendant's position would have felt at liberty to terminate the questioning and leave. *See State v. Reavley*, 2003 MT 298, ¶ 19, 318 Mont. 150, ¶ 19, 79 P.3d 270, ¶ 19; *State v. Dawson*, 1999 MT 171, ¶ 33, 295 Mont. 212, ¶ 33, 983 P.2d 916, ¶ 33; *Rushton*, 264 Mont. at 256, 870 P.2d at 1360. Thus, demonstrating that the facts of *Rushton* were "more intimidating" would not establish that Munson was not in custody.

¶40 Finally, the State also argues that *Osteen* and *Rushton* are distinguishable because in the case at hand, Johnson stated to Munson: "If you don't sign [the Consent to Search form] here's what happens. We're gonna' get up and we're gonna' go out that door. We're gonna' leave." Yet, Johnson made this statement *after* Munson had admitted that she had paraphernalia in the apartment and that she had used methamphetamine there during the previous twenty-four hours. In point of fact, the Officers did *not* tell Munson at any point that they would leave if she simply asked them to do so.

¶41 We remained convinced that under the totality of the circumstances surrounding the Officers' interview of Munson in her apartment, a reasonable person in Munson's position would not have felt free to terminate the interview and leave or ask the Officers to leave. Accordingly, we hold that Munson was, for purposes of *Miranda*, "in custody."

Interrogation

21

¶42    Neither the State nor Munson sets forth a separate analysis on the question of whether she was subject to an "interrogation." Rather, they both treat "custodial interrogation" as a single inquiry and focus primarily on the question of whether Munson was "in custody." Here, we have concluded that Munson was, in fact, in custody. Yet, simply because an individual was in custody does not mean that *Miranda* warnings were required. *See Innis*, 446 U.S. at 300, 100 S. Ct. at 1689 ("[T]he special procedural safeguards outlined in *Miranda* are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation."). Thus, the State and the defendant should, in all cases, address both the "in custody" and the "interrogation" questions with separate analyses. (Likewise, for purposes of creating a complete record on appeal, trial courts analyzing motions to suppress statements should include separate and clearly designated analyses of the "in custody" and "interrogation" questions.)

¶43    Irrespective of the parties' failure to set forth a separate analysis of "interrogation" in their respective briefs, we consider this issue to be relatively straightforward on the record before us. As explained above, "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The primary focus in determining whether an incriminating response was reasonably likely to be elicited from the suspect is on the perceptions of the suspect, rather than on the intent of the police.

¶44    Here, at the outset of the Officers' "visit," Basnaw asked Munson if she had had any methamphetamine in the apartment the previous night and if she had any drugs in the

22

apartment at present. He then explained to Munson that he and Johnson were there to "follow up" on information that methamphetamine was presently, or had been the night before, in Munson's apartment. Next, Johnson opined that "[t]here's some pretty bad stuff goin' on here," and he questioned Munson at length about her lifestyle, whether she needed rehab, and whether she was raising her children properly. Johnson then asked, "So have you got crank in this house?" Shortly thereafter Munson admitted that she had paraphernalia and that she had used methamphetamine during the previous twenty-four hours.

¶45 The dialogue between the Officers and Munson reflects express questioning by the Officers as well as words and actions on their part that they should have known were reasonably likely to elicit incriminating responses from Munson. Indeed, Basnaw testified at the suppression hearing that he "wanted to speak to her about the activities that night, give her an opportunity to tell me if George Snell had been there and they had been using methamphetamine and if there were any drugs in the house." In addition, he testified that he "wanted to give her an opportunity either to prove or disprove the statements that were made basically against her by Mr. Snell." Likewise, Johnson testified that "the intent of that meeting [at Munson's apartment] was to conduct an interview with Julie [sic] Munson" regarding "information from George Snell, who had been arrested the night before or during the morning hours . . . that indicated there might be some drug activity there."

¶46 We hold, therefore, that Munson was, for purposes of *Miranda*, subject to an "interrogation."

Custodial Interrogation

23

¶47	Because Munson was interrogated in a custodial atmosphere, she was entitled to the *Miranda* warnings under the Fifth Amendment to the United States Constitution and Article II, Section 25 of the Montana Constitution. The Officers' failure to preface their questions with these warnings renders inadmissible the statements Munson made, and the District Court thus erred when it denied Munson's motion to suppress those statements. We accordingly reverse the District Court's order denying Munson's motion to suppress her statements.

¶48	***Issue 2. Did the District Court err in denying Munson's motion to suppress evidence seized from her apartment and vehicle?***

¶49	The Fourth Amendment to the United States Constitution and Article II, Section 11 of the Montana Constitution safeguard the right of the people to be secure in their persons, papers, homes, and effects from unreasonable searches and seizures. Unlike its federal counterpart, however, the Montana Constitution also explicitly ensures the right of individual privacy. Specifically, Article II, Section 10, states: "The right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest." Search analysis in Montana, therefore, is typically conducted under both Article II, Section 10, and Article II, Section 11. *See State v. Siegal*, 281 Mont. 250, 264-65, 934 P.2d 176, 184 (1997), *overruled in part on other grounds*, *State v. Kuneff*, 1998 MT 287, ¶ 19, 291 Mont. 474, ¶ 19, 970 P.2d 556, ¶ 19; *State v. Scheetz*, 286 Mont. 41, 45, 950 P.2d 722, 724 (1997); *State v. Tackitt*, 2003 MT 81, ¶ 17, 315 Mont. 59, ¶ 17, 67 P.3d 295, ¶ 17. Furthermore, we have long held that the unique language of the Montana Constitution affords Montanans broader protection than does the Fourth Amendment in cases

involving searches of, or seizures from, private property. *See State v. Sawyer*, 174 Mont. 512, 515, 571 P.2d 1131, 1133 (1977), *overruled in part on other grounds*, *State v. Long*, 216 Mont. 65, 67, 71, 700 P.2d 153, 155, 157 (1985); *State v. Bullock*, 272 Mont. 361, 384, 901 P.2d 61, 75 (1995); *State v. Bassett*, 1999 MT 109, ¶ 42, 294 Mont. 327, ¶ 42, 982 P.2d 410, ¶ 42.

¶50 Warrantless searches and seizures are per se unreasonable, subject to only a few carefully drawn exceptions. *State v. Elison*, 2000 MT 288, ¶ 39, 302 Mont. 228, ¶ 39, 14 P.3d 456, ¶ 39; *see also State v. Rushton*, 264 Mont. 248, 257, 870 P.2d 1355, 1361 (1994), *overruled in part on other grounds*, *State v. Hermes*, 273 Mont. 446, 449, 904 P.2d 587, 589 (1995); *State v. Gomez*, 2007 MT 111, ¶ 23, 337 Mont. 219, ¶ 23, 158 P.3d 442, ¶ 23; *Payton v. New York*, 445 U.S. 573, 586, 100 S. Ct. 1371, 1380 (1980). One such exception is consent, when it is given knowingly and voluntarily by an individual who has the authority to consent to the search and seizure. *See State v. Copelton*, 2006 MT 182, ¶ 18, 333 Mont. 91, ¶ 18, 140 P.3d 1074, ¶ 18; *State v. Schwarz*, 2006 MT 120, ¶¶ 9-10, 332 Mont. 243, ¶¶ 9-10, 136 P.3d 989, ¶¶ 9-10; *State v. Parker*, 1998 MT 6, ¶ 20, 287 Mont. 151, ¶ 20, 953 P.2d 692, ¶ 20; *Rushton*, 264 Mont. at 257, 870 P.2d at 1361. The prosecution carries the burden of establishing that consent to a warrantless search was freely and voluntarily given and was uncontaminated by any express or implied duress or coercion. *State v. Olson*, 2002 MT 211, ¶ 20, 311 Mont. 270, ¶ 20, 55 P.3d 935, ¶ 20; *Rushton*, 264 Mont. at 257-58, 870 P.2d at 1361.

¶51 We have adopted the Supreme Court's totality of the circumstances test for determining whether consent was given freely and voluntarily and without duress or

coercion. *See State v. Wetzel*, 2005 MT 154, ¶ 16, 327 Mont. 413, ¶ 16, 114 P.3d 269, ¶ 16; *Rushton*, 264 Mont. at 258, 870 P.2d at 1361; *see also Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 227, 248-49, 93 S. Ct. 2041, 2047, 2048, 2059 (1973). This test focuses on "the nature of [the individual's] subjective understanding," *Schneckloth*, 412 U.S. at 230, 93 S. Ct. at 2049, which in turn depends on "the characteristics of [the individual] and the details of the interrogation," *Schneckloth*, 412 U.S. at 226, 93 S. Ct. at 2047. A number of considerations are pertinent to this inquiry, such as whether the individual was in custody or under arrest at the time consent was requested; whether consent was sought after the search had already been conducted; whether the individual was expressly informed that he or she had the right not to consent to the search; whether the individual was told that a search warrant could be obtained; whether the individual was advised of his or her constitutional rights; the repeated and prolonged nature of the questioning; the individual's age, education, and intelligence; and whether the individual was threatened or coerced in any manner. *See Wetzel*, ¶ 17; *Schneckloth*, 412 U.S. at 226, 93 S. Ct. at 2047; *United States v. Patayan Soriano*, 361 F.3d 494, 502 (9th Cir. 2004). In the end, however, the determination of whether consent was given freely and voluntarily and without duress or coercion depends on the totality of all of the surrounding facts, and no single fact is dispositive. *Copelton*, ¶ 19.

¶52 In its order denying Munson's motion to suppress the evidence collected from her residence and automobile, the District Court stated that Munson "was aware the officers would leave her home if she decided not to talk with them," that she "was advised several times she did not have to sign the consent form," and that the Officers "made no promises to Munson before she consented to the search, nor did they threaten to circumvent the scope of

26

her consent absent a warrant." The court thus reasoned that "Munson analyzed the situation she was in, and came to the conclusion in her own mind that it was in her best interest to volunteer the drug paraphernalia, risk the possibility of what she thought was only a misdemeanor charge, and obtain help." Therefore, the court concluded, "Munson knowingly and voluntarily consented to the search."

¶53 Munson challenges the District Court's conclusion in light of the following circumstances. First, Munson points out that she was not informed by the Officers that she could refuse their entry into her apartment and, furthermore, that when she in fact asked them if they would come back, Basnaw insisted that he needed to visit with her "right now." Second, although Basnaw told Munson that he and Johnson were there to visit with her regarding "that situation last night with George Snell over here," few of their questions actually pertained to Snell or his activities. Instead, Munson asserts, "[the Officers] lectured her about her lifestyle, implied that they were there to help, and criticized her life to the point that [she] was crying for a good portion of the interview." Third, Munson refused twice at the outset of the questioning to consent to a search of her apartment, but the Officers did not accept her refusals and leave. Instead they asked, "Why not?" and continued to question her until she ultimately gave consent. Fourth, when Basnaw produced the Consent to Search form, he explained that the form "just says that your, you're uh, having been informed of your right to refuse a search of your um, of your house . . ."; however, at this point the Officers had not actually told Munson that she had the right to refuse the search. Munson points out that, "[t]o the contrary, when she had refused to give consent fifteen minutes prior, the detectives had simply ignored her refusal, remained in her home, and continued their

interrogation." Fifth, Munson contends that there was an "implied threat" that she would be incarcerated if she did not consent to the search. According to Munson, Johnson's earlier comment that "[w]e didn't come here and take that Miranda card out" implied, at least in her mind, that "if she doesn't cooperate, they will *Mirandize* her and arrest her." Lastly, Munson argues that in its order, the District Court "blatantly ignore[d] the lengthy time of the interrogation, or the coercive nature of the interrogation" and "state[d] the facts as if Ms. Munson willingly made admissions without any prompting or effort by the detectives." This view of the events, Munson maintains, "is wholly unsupported by the facts." In sum, Munson asserts that the State did not meet its burden of proving that her consent was given freely and voluntarily and was uncontaminated by any express or implied duress or coercion, and that the District Court erred in concluding otherwise.

¶54 In response, the State argues that Munson's consent was given voluntarily for the following reasons. First, the State notes that Munson initially refused the Officers' request to search the apartment and Munson's person and that when she finally allowed a search for paraphernalia, "she retained some control over where the officers looked." Thus, in the State's view, "Munson was not intimidated so as to deprive her of the power of consent." Second, the State maintains that "[e]ven though the officers were there to investigate criminal activity, that does not contradict their stated desire to help Munson get out of the pattern of drug use that was evident to them all." The State acknowledges that the Officers "could have left to seek a warrant before they obtained Munson's consent to search, but how would that have benefited her?" Third, the State suggests that the length of an interview "is simply one of many factors, and it did not appear significant here." Lastly, the State asserts that "[t]his is

28

not a case in which the police wore down a suspect," since Munson "was in her own home" and "made choices throughout the incident." Likewise, the State asserts that "[t]his was not a coerced decision. It was made under emotional circumstances, and Munson certainly knew that her drug use was a problem for her, but she still made choices that reflected calculation--albeit with mistaken assumptions that were not the result of being misled by the police." Thus, in sum, the State maintains that the District Court "correctly concluded, assessing all the circumstances, that Munson's consent to search was voluntary."

¶55    Having considered the foregoing arguments and the record before us, we conclude that the totality of the circumstances weighs in Munson's favor. Although there unquestionably are circumstances supporting both sides of the consent issue, we consider the following facts to be most significant.

¶56    First, Munson indicated to the Officers upon their arrival that she did not want to visit with them at that time, but they insisted on visiting with her "right now," thereby creating a coercive dynamic at the outset of the interview. Second, Munson unequivocally refused *twice* at the outset of the questioning to consent to a search of her apartment, but the Officers nevertheless pressured her to change her mind, thereby conveying that they would not take "No" for an answer. In this regard, we are not persuaded by the emphasis the State places on the Officers' altruistic motive in going to Munson's apartment "to help [her] get out of the pattern of drug use"—a characterization that is dubious in light of Basnaw's statement, upon the Officers' arrival, that he and Johnson were there to "follow up" on allegations of criminal activity involving Munson and her apartment. Indeed, the State's portrayal of the events is

29

belied by Basnaw's own characterization (while requesting transportation of Munson) of what had just transpired:

> Hi Hillary it's Jase. Good. Hey that female I talked to ya' about I'm at her house now. We did a consent to search and I'm gonna' end up takin' her to jail. Yeah. We got a little bit o' meth and meth paraphernalia. She's got a 1-year-old and a 5-year-old. So how do ya' like that? Hahaha. Made to order.

¶57 Third, the Officers employed what could fairly be characterized as psychological tactics to obtain Munson's consent. *Cf. Schneckloth*, 412 U.S. at 229, 93 S. Ct. at 2049 ("In examining all the surrounding circumstances to determine if in fact the consent to search was coerced, account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents."). For instance, Johnson told Munson that "[t]here's some pretty bad stuff goin' on here," opined that she was at "a fork in the road," offered ideas on how she might change her life, and then suggested that signing the consent form would be the wise choice for her to make, noting that "[t]he decision you make today is gonna' determine where your children are raised." As a result, Munson's consent ultimately was given while she was in an extremely emotional state brought on by the Officers' lecturing her at length about her lifestyle, her children, and her future. For this reason, we cannot agree with the State that "[t]his is not a case in which the police wore down a suspect." To the contrary, our review of the thirty-one-page transcript covering the approximately one hour and forty-five minutes that the Officers were at Munson's apartment leads inescapably to the conclusion that Basnaw and Johnson's approach achieved exactly what they had intended: to wear Munson down to the point where she made inculpatory statements and yielded to their warrantless search of her home.

30

¶58    Lastly, although the Officers did indeed tell Munson that she *did not* have to sign the Consent to Search form, they also told her that she *did* have to sign the form.  As a matter of fact, the transcript reflects virtually simultaneous contradictory statements by the Officers in this regard; at the very least, their statements to Munson that she did not have to sign the form were equivocal.

¶59    Based on the totality of the circumstances, we conclude that Munson's consent was not given freely and voluntarily and without duress or coercion.  Thus, all evidence seized by the Officers under the guise of Munson's consent is inadmissible.  We accordingly reverse the District Court's order denying Munson's motion to suppress that evidence.

## CONCLUSION

¶60    Because Munson was interrogated in a custodial atmosphere, she was entitled to the *Miranda* warnings.  The Officers' failure to preface their questions with those warnings renders Munson's statements inadmissible, and the District Court therefore erred when it denied Munson's motion to suppress those statements.

¶61    Furthermore, because Munson's consent to search was not given freely and voluntarily and without duress or coercion, all evidence seized by the Officers under the guise of that consent is inadmissible, and the District Court therefore erred when it denied Munson's motion to suppress that evidence.

¶62    Reversed and remanded with instructions to grant Munson's motion to suppress and for further proceedings consistent with this Opinion.

31

/S/ JAMES C. NELSON


We Concur:

/S/ KARLA M. GRAY
/S/ JIM RICE
/S/ PATRICIA COTTER
/S/ BRIAN MORRIS